Hillsborough-southern judicial district
No. 2001-262

## THE STATE OF NEW HAMPSHIRE

v.

## DONALD ROACHE

Argued: March 6, 2002
Opinion Issued: July 15, 2002

*Philip T. McLaughlin*, attorney general (*Stephen D. Fuller* on the brief and orally), for the State.

*Stein, Volinsky & Callaghan, P.A.*, of Concord (*Scott F. Johnson* on the brief and orally), for the defendant.

BROCK, C.J. The State of New Hampshire appeals, pursuant to RSA 606:10 (1986), from orders of the Superior Court (*Hollman*, J.) granting, in part, the defendant's motion to suppress statements. The court ruled that Part I, Article 15 of the New Hampshire Constitution requires the police to inform a suspect, during a custodial interrogation, of an attorney's specific efforts to contact him or offer assistance in order for the suspect's *Miranda* waiver to be valid. We affirm.

The relevant facts are undisputed. On June 15, 2000, two detectives from the Nashua Police Department went to the residence of the defendant, Donald Roache, and asked if he would accompany them to the police station to answer questions about an investigation involving his stepdaughter. He agreed, and prior to leaving his house, called his wife to tell her that he was going to the police station. She then called Attorney

Andru Volinsky and retained him to represent the defendant. The defendant had not asked his wife to call an attorney.

The defendant arrived at the police station at approximately 4:45 p.m. Detective Brown escorted him to a small interview room. After asking some preliminary background questions, Detective Brown presented the defendant with a *Miranda* waiver form, which he reviewed and signed at 4:53 p.m. Detective Brown asked the defendant if he knew why he was being questioned. The defendant responded that it was because he molested his stepdaughter and that he was not going to deny it. Thereafter, Detective Brown read the defendant his *Miranda* warnings again and made an audio recording of the interview, which lasted approximately thirty minutes and ended at 5:58 p.m.

Meanwhile, at 4:50 p.m., Attorney Volinsky called the Nashua Police Department and spoke to Officer Yurcak. Attorney Volinsky explained that he was the defendant's attorney and asked to speak with the defendant. Officer Yurcak initially did not know whether the defendant was in the building, but called Attorney Volinsky back at 5:06 p.m. and stated that the defendant was in the station with Sergeant Mark Manley, the supervisor on duty. Attorney Volinsky then called Sergeant Manley and left a voice mail message that the defendant's wife had retained him and that all questioning should cease until he spoke with the defendant.

Sergeant Manley spoke to Attorney Volinsky at 5:44 p.m., but refused to stop the interview. Manley told Volinsky that the department had a practice of not interrupting interviews when an attorney was trying to contact a client unless the client had requested counsel.

The defendant was charged with multiple counts of aggravated felonious sexual assault, *see* RSA 632-A:2, I(j)(1) (1996), and one count of attempted aggravated felonious sexual assault. *See id.*; RSA 629:1 (1996). He moved to suppress the statements he made at the Nashua Police Department. Based on the facts set forth above, the trial court ruled: (1) that the defendant was in custody for the purposes of invoking *Miranda* protection; and (2) the police department's failure to inform the defendant of his attorney's efforts to contact him vitiated his waiver of his *Miranda* rights. The court found that the duty to inform the defendant of his attorney's attempts to contact him arose at 5:06 p.m., when Officer Yurcak learned of the defendant's whereabouts. Therefore, any statements made by the defendant after 5:06 p.m. were suppressed.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. *See State v. Wallace*, 146 N.H. 146, 148 (2001). Our review of the trial court's legal conclusions, however, is *de novo. See id.* The level of constitutional protection provided by Part I, Article 15 in this

context is strictly a question of law, which we review *de novo*. *See State v. Paulsen*, 143 N.H. 447, 449 (1999).

The State does not challenge the trial court's conclusion that the defendant was in custody, but argues that the police department's failure to inform the defendant of his attorney's efforts to contact him did not render inoperative his waiver of the presence of counsel. The defendant relies solely upon the New Hampshire Constitution, as his claim is untenable under the Federal Constitution. The United States Supreme Court has held that efforts by counsel to contact a suspect who is in custody have no bearing on the validity of that suspect's waiver of rights guaranteed by *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Moran v. Burbine*, 475 U.S. 412, 422 (1986).

The defendant in *Moran* was arrested in connection with a burglary. *Id.* at 416. While he was in custody, the police learned of facts implicating him in a murder. *Id.* After being informed of his *Miranda* rights and executing a series of written waivers, the defendant confessed to the murder. *Id.* at 415. The defendant did not at any time request an attorney. *Id.* While the defendant was in custody, however, his sister obtained a lawyer to represent him. *Id.* The attorney telephoned the police station and was assured that the defendant would not be questioned further until the next day. *Id.* The interrogation session continued, however, and the defendant made a number of inculpatory statements. *Id.* He was never informed that his sister had retained an attorney to assist him, or that the attorney was trying to reach him. *Id.* at 415-16. He was later found guilty of first degree murder. On appeal to the United States Supreme Court, he argued that his inculpatory statements should have been suppressed.

The Court held that the action of the police did not violate the defendant's Fifth Amendment right against self-incrimination. *Id.* at 420. Applying traditional waiver principles, and after noting that the waiver was otherwise voluntary, the court stated that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Court reasoned:

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 422-23. While the Court refused to require police to inform a suspect of an attorney's efforts to reach the suspect as a matter of federal constitutional law, the court recognized that "[n]othing we say today

disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Id.* at 428.

Since *Moran*, a number of state supreme courts have held that the due process and/or self-incrimination provisions of their state constitutions require broader protection than is afforded by *Moran. See, e.g., Com. v. Mavredakis*, 725 N.E.2d 169 (Mass. 2000); *People v. Bender*, 551 N.W.2d 71 (Mich. 1996); *People v. McCauley*, 645 N.E.2d 923 (Ill. 1994); *West v. Com.*, 887 S.W.2d 338 (Ky. 1994); *State v. Simonsen*, 878 P.2d 409 (Or. 1994); *State v. Reed*, 627 A.2d 630 (N.J. 1993); *Bryan v. State*, 571 A.2d 170 (Del. 1990); *State v. Stoddard*, 537 A.2d 446 (Conn. 1988); *People v. Houston*, 724 P.2d 1166 (Cal. 1986) (superseded by constitutional amendment). Other States have adopted *Moran* when analyzing their state constitutional provisions. *See, e.g., State v. Stephenson*, 878 S.W.2d 530 (Tenn. 1994); *Mitchell v. State*, 816 S.W.2d 566 (Ark. 1991); *State v. Earls*, 805 P.2d 211 (Wash. 1991); *McClaskey v. State*, 540 N.E.2d 41 (Ind. 1989); *State v. Hanson*, 401 N.W.2d 771 (Wis. 1987); *Lodowski v. State*, 513 A.2d 299 (Md. 1986). We determine today whether the New Hampshire Constitution requires law enforcement officers undertaking the custodial interrogation of a suspect to inform the suspect that an attorney retained on his or her behalf is attempting to contact the defendant.

■ "The New Hampshire Constitution guarantees a criminal defendant protection from involuntary self-incrimination." *State v. Benoit*, 126 N.H. 6, 14 (1985); *see* N.H. CONST. pt. I, art. 15. While neither the Federal nor the New Hampshire Constitutions "require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation," *Miranda*, 384 U.S. at 490, both the United States Supreme Court and this court have developed rules for safeguarding the rights that guarantee the defendant certain procedural protections. Thus, when a person is taken into custody or deprived of his freedom in any significant way, and prior to interrogating him, the police must tell him that he has a right to remain silent, that anything he says can and will be used against him, and that he has a right to counsel. *Id.* at 467-72; *State v. Munson*, 126 N.H. 191, 193 (1985). If the person asserts any of these rights, all questioning must cease. *Miranda*, 384 U.S. at 474; *Munson*, 126 N.H. at 193. While these so-called *Miranda* warnings are "not themselves rights protected by the Constitution," *Michigan v. Tucker*, 417 U.S. 433, 444 (1974), they are procedural safeguards necessary to dissipate the atmosphere of compulsion inherent in a custodial interrogation. *See Miranda*, 384 U.S. at 467.

■ Accordingly, before statements made by a defendant during custodial interrogation may be considered as evidence, the State must

prove beyond a reasonable doubt, *State v. Phinney*, 117 N.H. 145, 147 (1977), that the defendant was warned of his constitutional rights, *see State v. Nash*, 119 N.H. 728, 730 (1979), and that any subsequent waiver of those rights was voluntary, knowing and intelligent. *See State v. Plante*, 133 N.H. 384, 386 (1990). "The requirement of a knowing and intelligent waiver implies a rational choice based upon some appreciation of the consequences of the decision." *State v. Bushey*, 122 N.H. 995, 999 (1982).

In determining whether the failure to inform the defendant that an attorney retained on his behalf was attempting to contact him vitiates his otherwise voluntary waiver of the right to counsel, we look to the text, our prior interpretations of Part I, Article 15, and the reasoning of those courts that have interpreted similar constitutional language. The guiding principle is, as the trial court noted, whether the rule set forth in *Moran* "adequately protects a defendant's privilege against self-incrimination under [P]art I, [A]rticle 15 of the New Hampshire Constitution." *State v. Laurie*, 135 N.H. 438, 442 (1992).

The relevant text of Part I, Article 15 is broader than the Fifth Amendment. The Fifth Amendment, in relevant part, states, "[N]or shall [any person] be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Part I, Article 15 states, "No subject shall ... be compelled to accuse or furnish evidence against himself." N.H. CONST. pt. I, art. 15. This language is identical to the language contained in Part I, Article 12 of the Massachusetts Constitution.

In *Mavredakis*, 725 N.E.2d at 178, the Supreme Judicial Court of Massachusetts held that the text, history, and prior cases interpreting Article 12 supported the conclusion that it provided greater protection than the Federal Constitution. The court noted that the Massachusetts Constitution preceded and was independent of the Federal Constitution, that Article 12 "evolved from a sense of disapproval of the inquisitorial methods of the Star Chamber and ecclesiastical courts in England," and that the court's precedents had interpreted Article 12 expansively. *Id.* at 178. New Hampshire incorporated this privilege into its constitution four years after Massachusetts passed its constitution. *State v. Cormier*, 127 N.H. 253, 262 (1985) (King, C.J., and Douglas, J., dissenting). Given that the language of the privilege is identical, and given the shared history of our state constitutions, we give weight to the Massachusetts Supreme Judicial Court's interpretation of Part I, Article 12 when assessing Part I, Article 15 of the New Hampshire Constitution. *Cf. Claremont School Dist. v. Governor*, 138 N.H. 183, 186 (1993).

Our prior interpretations of Part I, Article 15 also support the conclusion that it provides greater protection in this case than does the Federal Constitution. While we have suggested that the privileges

protected by the Fifth Amendment and Part I, Article 15 are "comparable in scope," *see Knowles v. Warden, N.H. State Prison,* 140 N.H. 387, 391 (1995); *Cormier,* 127 N.H. at 255, we have also declined to follow federal standards when those standards did not sufficiently protect the rights of New Hampshire citizens. In *State v. Phinney,* for example, we held that to determine whether a confession is admissible, the trial court must determine whether the confession was voluntary beyond a reasonable doubt. *Phinney,* 117 N.H. at 147. In so holding, we adopted a more stringent standard under the New Hampshire Constitution than the "preponderance of the evidence" standard the United States Supreme Court had concluded satisfied federal constitutional requirements. *Id.* at 146. We stated:

> A confession is a special type of evidence. Its acceptance basically amounts to conviction. Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities.

*Id.* at 147. We have also recognized the particular importance of the right to counsel in protecting a New Hampshire citizen's right to freedom from self-incrimination during a custodial interrogation. *See State v. Tapply,* 124 N.H. 318, 323-25 (1983) (holding that suspect's statements "[s]hould I have a lawyer" or "[d]o I need a lawyer for this before I" are sufficient to invoke the right to counsel and stating that the right to counsel "is a fundamental one which transcends the enforcement of the criminal law and should be liberally observed by those who have sworn to uphold the constitution"). In view of these considerations, we conclude that Article 15 requires a higher standard of protection than that provided by *Moran.*

We disagree with the United States Supreme Court's conclusion that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him . . . can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran,* 475 U.S. at 422. Rather, we believe, like those state courts finding greater protection under their state constitutions, that "there is an important difference between the abstract right to speak with an attorney mentioned in the [*Miranda*] warnings, and a concrete opportunity to meet with an identified attorney actually able to provide at least initial assistance and advice." *Mavredakis,* 725 N.E.2d at 178 (quotation omitted); *see also Bender,* 551 N.W.2d at 79

n.16; *McCauley*, 645 N.E.2d at 939; *Wright*, 490 N.W.2d at 356; *Stoddard*, 537 A.2d at 453. "[T]he presence and availability of a retained attorney is critical information that qualitatively affects the exercise by a suspect of the right to consult with counsel. When that information is withheld, the suspect's waiver of the right to counsel and to remain silent is more abstract than real, becoming, in effect, a waiver of a theoretical right that is uninformed by the material knowledge that retained counsel, present and available to assist the suspect in the full exercise of his or her rights, is just outside the door." *Reed*, 627 A.2d at 649 (Stein, J., concurring).

Requiring the police to inform a suspect of an attorney's efforts to assist him ensures that the suspect's right to counsel and right to be free from self-incrimination are substantively meaningful and that any waiver of those rights is knowing and intelligent. *See Mavredakis*, 725 N.E.2d at 179. Furthermore, a contrary rule would "lend tacit approval to affirmative police interference with the attorney-client relationship," *id.*, and, as the Michigan Supreme Court has noted,

> would encourage the police to do everything possible, short of a due process violation, to prevent an attorney from contacting his client before or during interrogation. Once the suspect signed the waiver form, police could interrogate the suspect in isolation, without the assistance of his own lawyer, even if that lawyer is making an actual effort to consult with the suspect. To encourage this type of police behavior would undermine the safeguards we have established to protect the rights to remain silent and to counsel. If these rights are to mean anything, surely we must be adamant in our protection of them.

*Bender*, 551 N.W.2d at 80.

We recognize that the police have no general duty to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran*, 475 U.S. at 422. However, we believe that withholding information that an attorney is available or present to assist a suspect during an interrogation is qualitatively different from withholding other kinds of information which might affect the defendant's decisionmaking, but which are not a part of the *Miranda* warnings, such as knowledge of the quantity of the evidence and whether the police have other suspects. Withholding knowledge that an attorney is available to render assistance is not simply a failure to provide useful information, but is an "affirmative police interference in a communication between an attorney and a suspect. Moreover, the 'information' intercepted by the police bears directly on the right to

counsel that police are asking the suspect to waive." *Moran*, 475 U.S. at 456 n. 42 (Stevens, J., dissenting).

 For these reasons, we hold that when an attorney calls or arrives at the police station and identifies himself or herself as counsel retained for the suspect to an agent of the State in a position to contact the interrogating officers, the interrogating officers have a duty to stop questioning the suspect and inform the suspect that the attorney is attempting to contact him or her. *Mavredakis*, 725 N.E.2d at 179. The suspect may then choose whether or not to speak with the attorney. *Id.* If the suspect requests to speak with the attorney, then the police must comply with the holding in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). *See State v. Grant-Chase*, 140 N.H. 264, 266 (1995).

We note that our holding does not impose upon the police any duty beyond telling the defendant, without more, that an attorney retained on his or her behalf has contacted the police and to ask the defendant if he or she wishes to speak with the attorney. Thus, the police do not have to stop interrogation at the request of the attorney. Nor are the police required to relay an attorney's message not to answer any further questions. Furthermore, a non-lawyer cannot create a duty to inform by telling the police that the defendant has an attorney who would like to speak with the defendant. Rather, the duty arises only when an attorney personally telephones or arrives at the police station.

We disagree with the State that such a rule will unduly change the balance between the interests of law enforcement in investigating crime and the interests of a defendant to be protected by the requirements of *Miranda*. The additional safeguard we adopt today serves the central goal of *Miranda*, which is to dispel the inherently coercive atmosphere of a custodial interrogation, so that the suspect's waiver is truly voluntary, and any confession given, reliable.

We are not persuaded by the State's argument that our holding will lead to many practical problems in law enforcement. Before *Moran* was decided, a number of state courts had held that failure to inform a suspect that an attorney is actually available and seeking to provide assistance rendered any subsequent waiver of the suspect's *Miranda* rights invalid, and, as Justice Stevens noted in his dissent, the *Moran* majority did not point to any specific evidence from those jurisdictions that it had unduly complicated law enforcement. *See Moran*, 475 U.S. at 460. Furthermore, since *Moran* was decided in 1986, a number of state supreme courts have held that their constitutions afford greater protection than does *Moran*. The State has pointed to no evidence from those jurisdictions suggesting that the police have been hindered in their efforts to uphold the law.

Finally, we are unpersuaded by the State's argument that a rule requiring the police to inform a suspect that an attorney retained on his behalf is attempting to contact him should be rejected because it presents the possibility that one defendant who voluntarily waives his *Miranda* rights and makes inculpatory statements will not benefit from the rule, while another defendant will, even though the circumstances surrounding both the *Miranda* waivers and confessions were identical from the suspects' points of view. We recognize that certain defendants, such as those who do not have an attorney, and whose family members do not have the financial means, time, energy or personal resources to obtain one for them, will not benefit from the rule we announce today because they will be less likely to have a lawyer attempt to see them while they are in custody. However, like the New Jersey Supreme Court, "we have never taken a disparity in the actual ability of differently-situated defendants to make use of a right as an argument against affording that right. Accordingly, the fact that not every suspect will benefit from the rule . . . is no reason to deny the benefits of that rule to those suspects who may be advantaged by it." *Reed*, 627 A.2d at 645-46.

*Affirmed.*

BRODERICK and DUGGAN, JJ., concurred; NADEAU and DALIANIS, JJ., dissented.

DALIANIS and NADEAU, JJ., dissenting. Because we believe that the safeguards imposed by *Miranda v. Arizona*, 384 U.S. 436 (1966), and by our State Constitution sufficiently protect a suspect's privilege against self-incrimination, respectfully, we dissent.

*Miranda* "establishes an objective set of procedures to counter the inherent pressures of custodial interrogations." *State v. Torres*, 130 N.H. 340, 343 (1988); *see also Moran v. Burbine*, 475 U.S. 412, 420 (1986). These procedures require the police to warn suspects in custody of their *Miranda* rights before interrogating them, *Miranda*, 384 U.S. at 471-73, and to "scrupulously honor[]" a suspect's decision to exercise those rights, *Michigan v. Mosley*, 423 U.S. 96, 102-04 (1975). *See also State v. Laurie*, 135 N.H. 438, 442, *cert. denied*, 506 U.S. 886 (1992).

These procedures also mandate that any waiver of *Miranda* rights be made "voluntarily, knowingly and intelligently." *Moran*, 475 U.S. at 421 (quotation omitted). When examining the validity of a waiver, courts must indulge every reasonable presumption against finding a waiver. *See State v. Gullick*, 118 N.H. 912, 915 (1978). Accordingly, "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court

properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quotation omitted); *see State v. Gravel*, 135 N.H. 172, 178 (1991). Moreover, under our State Constitution, a waiver of *Miranda* rights must be proved beyond a reasonable doubt. *State v. Ford*, 144 N.H. 57, 60 (1999).

We believe that these procedures more than adequately "dissipate the compulsion inherent in custodial interrogation," *Moran*, 475 U.S. at 425, and thus would adopt the United States Supreme Court's reasoning in *Moran*.

We disagree with the majority that textual differences between Part I, Article 15 of our State Constitution and the Fifth Amendment to the Federal Constitution require us to reject *Moran*. This court has, on other occasions, *declined* to impose higher standards with respect to confessions than are required under federal law. In *Laurie*, 135 N.H. at 442, for instance, we concluded that *Mosley*'s "scrupulously honored" standard adequately protected a defendant's privilege against self-incrimination, despite Justice Brennan's express invitation to State courts to impose a higher standard under State law.

Like the United States Supreme Court, we fail to see how "[e]vents occurring outside of the presence of the suspect and entirely unknown to him" can in any way undermine a suspect's knowing, intelligent and voluntary waiver of his *Miranda* rights, *Moran*, 475 U.S. at 422, particularly when the State must prove the waiver was knowing, intelligent and voluntary beyond a reasonable doubt. As the court observed in *Moran*:

> No doubt the additional information would have been useful to [the suspect]; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

*Id.*

We also disagree with the majority that adhering to *Moran* "lend[s] tacit approval to affirmative police interference with the attorney-client relationship" and encourages "the police to do everything possible, short of a due process violation, to prevent an attorney from contacting his client before or during interrogation."

When a third party retains an attorney for a suspect, without the suspect's consent, there is no attorney-client relationship between the attorney and the suspect; if anything, there is only an attorney-client relationship between the attorney and the third party. Moreover, the

manner in which the police deal with the attorney, we believe, is irrelevant to determining whether the suspect has voluntarily, intelligently and knowingly waived his *Miranda* rights. "[A] rule that focuses on how the police treat an attorney — conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation — . . . ignore[s] both *Miranda's* mission and its only source of legitimacy." *Id.* at 425. Further, as the *Moran* court noted, "[a]lthough highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." *Id.* at 423.

The rule the majority adopts leads to incongruous, and we believe, unfair results. Under the majority's rule, the waivers of two defendants "armed with the same information and confronted with precisely the same police conduct," *id.* at 422, would be treated differently depending upon whether the defendants were affluent enough, experienced enough, or otherwise fortunate enough to have an attorney, or someone *posing* as an attorney, telephone the police station to speak to them. As the majority, in effect, concedes, this rule necessarily creates "two classes of suspects and favors those who are more likely to have access to counsel." *State v. Reed*, 627 A.2d 630, 652 (N.J. 1993) (Clifford, J., dissenting). We find this result troubling.