Hillsborough-southern judicial district
No. 2003-078

THE STATE OF NEW HAMPSHIRE

v.

DENIS VELEZ

Argued: January 7, 2004
Opinion Issued: February 27, 2004

*Peter W. Heed,* attorney general (*Stephen D. Fuller,* senior assistant attorney general, on the brief and orally), for the State.

*Landya McCafferty,* assistant appellate defender, of Dover, on the brief, and *David M. Rothstein,* deputy chief appellate defender, of Concord, orally, for the defendant.

DALIANIS, J. The defendant, Denis Velez, was convicted by a jury of one count of robbery, *see* RSA 636:1 (1996). He appeals his conviction, arguing that the Trial Court (*Hicks*, J.) erred in permitting the State to: (1) introduce his tape-recorded confession; and (2) read a transcript of a witness's testimony during trial. We affirm.

On the evening of May 23, 2001, Frances Loscocco was working behind the counter at the Churchside Market in Nashua, when a young man wearing a dark colored bandanna covering the lower half of his face and "something tight" covering his head, entered the store, pointed a gun at her, and said, "This is a stick up." Loscocco said, "Excuse me?" to which the man responded, "Give it up." Loscocco, thinking that someone was playing a "bad joke" on her, responded by banging her fist on the counter and ordering the man to get out.

The man said again, in a slightly louder tone, "Give it up." Loscocco, at this point realizing that it wasn't a joke, again, in a more forceful tone, ordered the man to get out, while reaching for the phone to dial 911. At this point Loscocco noticed that another man with a gun and "something over his face" had entered the store; however, after Loscocco repeated her demand for the second time, both men fled. Loscocco called 911 and spoke with officers about the incident.

Two days later, on May 25, the police met with Loscocco at the Churchside Market to show her a photographic array of eight "head shots" of possible suspects. Using her hand to cover the bottom portion of each face, Loscocco identified the defendant as a 60% to 70% match for the man who pointed the gun at her.

Three days later, on May 28, the police located the defendant. Detectives Dennis Linehan and Todd Therrien asked him if he was willing to speak with them at the police station. The defendant agreed to do so and accompanied the detectives to the police station.

The detectives began interviewing the defendant at 8:50 p.m. and soon began to ask him about the robbery. For thirty minutes, the defendant denied any involvement with the robbery, but at 9:30 p.m. he admitted involvement. Detective Linehan testified at trial that the defendant stated that he had entered the Churchside Market with a "BB" gun, pointed the gun at the clerk, and told her to "give it up." Detective Linehan also testified that the defendant stated that he saw that the clerk was scared, had second thoughts, and ran from the store. The detectives then, at 9:43 p.m., read the defendant his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The defendant waived his *Miranda* rights at 9:49 p.m., at which point the detectives asked him if he was willing to allow them to record a

statement regarding the robbery. The detectives recorded the defendant's statement from 9:54 p.m. to 10:13 p.m. During the recorded statement the defendant explained how he had held the "BB" gun during the robbery and how he had disguised himself.

After the defendant's statements were recorded, he was arrested. Immediately thereafter, the police attempted, with the defendant's cooperation, to locate the "BB" gun and jacket used in the robbery, but were unable to find either piece of evidence.

The defendant was subsequently indicted for one count of robbery. *See* RSA 636:1. His first trial resulted in a hung jury. After a four-day retrial, he was convicted.

Before the second trial, the defendant filed a motion *in limine* to suppress his tape-recorded statement, which the trial court denied. Additionally, the State moved to admit a transcript of the testimony of Lawrence Nelson, who had testified at the previous trial, but was allegedly unavailable for the second trial. The trial court granted the State's motion and allowed Nelson's testimony to be read to the jury. Nelson's brief testimony was that the defendant told him, a few days after the robbery, that he had used a gun to rob the Churchside Market.

The defendant raises two issues on appeal. First he argues that the trial court erred by denying his motion to suppress his tape-recorded statement. The defendant contends that the trial court failed to follow our recording rule as laid out in *State v. Barnett*, 147 N.H. 334 (2001), and violated his right to due process under the Fifth Amendment of the Federal Constitution and Part I, Article 15 of the State Constitution. Second, the defendant argues that the trial court erred in granting the State's motion to admit Nelson's testimony from the previous trial because the State failed to demonstrate Nelson's unavailability for trial. The defendant contends that the trial court violated his right to due process and confrontation under the Fifth and Sixth Amendments of the Federal Constitution and Part I, Article 15 of the State Constitution.

We first address the defendant's claims under the State Constitution and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

*I. Tape Recorded Confession*

In *Barnett* we established the clear rule that in order to admit into evidence the taped recording of an interrogation, which occurs after *Miranda* rights are given, the recording must be complete. *See Barnett*, 147 N.H. at 338. The defendant argues that our holding in *Barnett* must be extended to include pre-*Miranda* statements.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's findings unless they lack support in the record or are clearly erroneous. Our review of the trial court's legal conclusions, however, is *de novo. State v. MacElman*, 149 N.H. 795, 797 (2003).

■ We created the recording rule in *Barnett* to prevent the practice of selective recording and the dangers attached therewith. *See Barnett*, 147 N.H. at 337-38. In doing so, we addressed the inequities inherent in selectively recording a post-*Miranda* custodial interrogation and held that all of a defendant's statement following the waiver of *Miranda* rights must be recorded for trial, if the recording is to be admitted into evidence at trial. *See id.* In this case, the State introduced a complete recording of the defendant's post-*Miranda* custodial statement. Therefore, the problem of selective recording present in *Barnett* is not present in this case.

The defendant next argues that we should expand *Barnett* to cover his pre-*Miranda* statements, pointing to our statement in *Barnett* that "listening to a defendant be inculpated by his or her own voice has a persuasive power unrivaled by contradictory testimonial evidence." The defendant contends that the same principle exists in his case because the State introduced tape-recorded evidence of his post-*Miranda* inculpatory statements, which he could contradict only with testimonial evidence of his pre-*Miranda* exculpatory statements.

■ We see no need to extend our recording rule in *Barnett* to encompass the full recording of both post-*Miranda* and pre-*Miranda* statements as a prerequisite for the State's introducing a complete recording of a defendant's post-*Miranda* statement. *See State v. Conger*, 652 N.W.2d 704, 707-08 (Minn. 2002) (declining to expand its recording rule to encompass noncustodial statements). The *Miranda* warnings provide a logical dividing line for our requirements as laid out in *Barnett*, because such warnings afford the defendant an objective awareness that anything he says can and will be used against him in court, *see State v. Roache*, 148 N.H. 45, 48 (2002), and because, for example, it would be impractical to require the police to record every interaction with every potential defendant in the wide variety of non-custodial situations that arise daily in law enforcement.

The defendant argues, however, that we need not require the recording of all pre-*Miranda* statements, but should do so when the police have easy access to recording devices, such as in this case where the interrogation took place at the police station. The defendant contends that such a requirement is practical and provides clear guidance to the police.

The defendant's proposed rule, however, would amount, in practical effect, to a mandatory recording requirement for all police station interrogation. Much of the police work during noncustodial interviews involves judging a suspect's credibility and attempting to discern a consistent story. The police often do not know whether their questioning will lead to an inculpatory statement or even whether they are talking to the actual person who committed the crime. Yet, under the defendant's proposed rule, the police would be obligated, even while unsure of whether they had the correct suspect, to record every minute of a police station interview because, if it later turned out that they did have the correct person, they would otherwise be precluded from introducing any recorded custodial statements at trial. We decline to adopt such a rule.

The defendant next argues that by not extending *Barnett* to cover a defendant's pre-*Miranda* statements we create a loophole for the police to manipulate the interrogation in an effort to record only post-*Miranda* inculpatory statements, thus defeating the purpose of *Barnett*. Therefore, the defendant attempts to analogize this situation to the selective recording present in *Barnett*. If the police were to manipulate the timing of *Miranda* warnings, however, this action would be subject to review under our *Miranda* jurisprudence, an inquiry independent of our *Barnett* analysis.

■ Finally, we address the defendant's due process argument. The standard for determining whether a law or procedure violates due process is whether it is fundamentally fair. *Barnett*, 147 N.H. at 336. In *Barnett*, we rejected the defendant's argument that the selective recording of his post-*Miranda* statements violated his right to due process, and instead exercised our supervisory jurisdiction to create our recording rule. *Id.* at 337-38. Consistent with our ruling in *Barnett*, we hold that due process does not require the recording of pre-*Miranda* statements. The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See Rogers v. Tennessee*, 532 U.S. 451, 460 (2001) (due process standard); *Barnett*, 147 N.H. at 337. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

*II. Nelson's testimony*

The State concedes that the trial court erred in admitting Nelson's testimony. The State argues, nevertheless, that we should affirm the defendant's conviction because the admission of Nelson's testimony constituted harmless error.

It is well settled that the erroneous admission of evidence is harmless only if the State proves, beyond a reasonable doubt, that the verdict was not affected by the admission. *State v. Thompson*, 149 N.H. 565, 567 (2003). An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.* The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and to promote public respect for the criminal process by focusing upon the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. *Id.*

The defendant's second trial lasted four days. The State's case consisted of the testimony of both Detectives Linehan and Therrien about the defendant's pre-*Miranda* admission of guilt, including how the defendant described, in detail, how he entered the Churchside Market with a "BB" gun, demanded that the clerk "give it up," and then fled the store after having "second thoughts." The State also introduced the tape-recorded confession of the defendant in which he spoke further about the robbery, repeated his admission, and described how he held the gun and disguised himself. Additionally, the State's case included the testimony of Loscocco about how, shortly after the robbery, she picked the defendant's picture out of a photo array as the man who had pointed the gun at her.

█ Nelson's testimony, including foundation information about himself and his relationship with the defendant, comprised a mere three and a half pages in the transcript. Nelson's testimony was inconsequential in relation to the State's overwhelming alternative evidence of guilt. Therefore, we hold that the State has satisfied its burden of proving harmless error beyond a reasonable doubt.

*Affirmed.*

NADEAU and DUGGAN, JJ., concurred.