**John Lee VANN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9887.

Court of Appeals of Alaska.

April 23, 2010.

---

80. *Id.* (footnote omitted).

81. *Cano v. Anchorage,* 627 P.2d 660, 664 (Alaska App.1981).

Sarah Kalish and Josie Garton, Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

The major question in this case is whether the superior court violated the defendant's right of confrontation under the Sixth Amendment to the United States Constitution when the superior court allowed a laboratory technician employed by the State Crime Lab to testify about the results of genetic testing performed by the Crime Lab, when a portion of that testing was conducted by another Crime Lab technician who did not testify.

In *Meléndez–Díaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), a cocaine trafficking case, the United States Supreme Court held that the Sixth Amendment's confrontation clause barred the government from relying on hearsay evidence—in the form of "certificates of analysis" prepared by three laboratory technicians—to prove that certain substances in the defendant's possession were, in fact, cocaine. 129 S.Ct. at 2532.

The Supreme Court declared that the lab technicians' certificates were "testimonial hearsay"—that is, the certificates were the type of hearsay barred by the confrontation clause—because the certificates were "functionally identical to live, in-court testimony": each certificate was "a solemn declaration or affirmation made for the purpose of establishing or proving some fact" in a court proceeding. *Ibid.*[1]

In the present case, the defendant John Lee Vann was charged with kidnapping and sexually assaulting a woman. At Vann's trial, the major disputed issue was the identity of the perpetrator. Vann claimed that he had never met the victim, that he was elsewhere on the night in question, and that if the victim was kidnapped and sexually assaulted, he was not the one who did it.

As part of the State's effort to establish that Vann was the culprit, the State presented the testimony of Cheryl Duda, a DNA analyst employed at the Alaska State Crime Detection Laboratory.

Duda testified that the Crime Lab received genetic samples from both Vann and the victim, and that these known samples were then compared to five samples of genetic material that were obtained from items associated with the crime. Duda tested three of these samples herself, but the other two samples were tested by Jessica Cohen, another DNA analyst working at the Crime Lab. Over Vann's objection, the superior court allowed Duda to describe and interpret the test results from all five samples.

The question is whether the superior court's ruling is incompatible with the Supreme Court's decision in *Meléndez–Díaz*. As we explain in more detail in this opinion, we conclude that *Meléndez–Díaz* does not bar the admission of the testimony that Vann challenges in this case. Here, in a nutshell, is our analysis:

Although Cheryl Duda's associate, Jessica Cohen, processed two of the samples (by running them through a machine that analyzes the genetic profile contained in DNA), Duda testified that (1) she herself interpreted the data read-outs produced by the machine from Cohen's two samples, and (2) the conclusions that Duda reached about the significance of the test results were her own. Thus, Duda was the "real" witness with respect to all five of the samples—much as a doctor would be the "real" witness regarding a diagnosis of illness, or a pathologist would be the "real" witness regarding a conclusion as to cause of death, even though the doctor or pathologist relied in substantial measure

---

1. Citing *Crawford v. Washington,* 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004).

on the results of testing conducted by laboratory technicians. Accordingly, Vann's right of confrontation under the Sixth Amendment was satisfied when he was afforded the opportunity to cross-examine Duda.

### A more detailed description of the challenged testimony

As we explained above, two DNA analysts working at the Alaska State Crime Detection Laboratory—Cheryl Duda and Jessica Cohen—participated in the testing of the samples in Vann's case.

Duda personally tested and obtained DNA from three samples: two swabs that were taken from bottles connected to the crime, and a swab of blood taken from the front passenger window of the vehicle involved.

As described by Duda, the testing of genetic samples consists of four steps. First, strands of DNA are chemically extracted from the sample. This is followed by the second step: a measurement of how much DNA has been obtained from the extraction. Third, the extracted DNA is "amplified"—chemically copied—so that there is a sufficient quantity to perform an analysis. Finally, the strands of DNA are analyzed at 15 or 16 different locations to see what alleles (*i.e.,* genetic variants) are found at those locations.

This final stage of the testing—the actual analysis of the genetic contents of the amplified DNA—is performed by a machine. At the time of Vann's trial, the State Crime Lab was using an "ABI–310 Genetic Analyzer" for this purpose. The machine chemically "reads" the genetic profile of the DNA, and then the machine produces a graph that visually depicts that genetic profile. This graph can be printed out for later review and comparison with test results from other samples.

After Duda performed this described testing on her three samples (the swabs from the two bottles, plus the blood swab), she compared the genetic profiles of these three samples to the genetic profiles generated from the known DNA samples taken from the victim and from Vann. The first bottle sample (referred to as sample "22–JFA" in the testimony) was a complete match of Vann's genetic profile. According to Duda, the

chance that the genetic material found on the bottle came from someone other than Vann was less than one in 1 quintillion (*i.e.,* one in 1 billion billion, or $10^{18}$).

The testing of the blood swab yielded identical results: the genetic profile of the DNA obtained from this blood was a complete match of Vann's genetic profile.

The sample obtained from the second bottle (referred to as sample "25–JFA" in the testimony) yielded DNA from more than one source. Although Duda could not say for sure, it appeared that this sample contained DNA from both Vann and the victim: every DNA location that was testable in this sample yielded results that were consistent with either Vann's genetic profile or the victim's genetic profile.

In addition to testing these three samples, Duda also reviewed the report of the testing conducted by her associate, Cohen, on two other samples. One of these samples came from the victim's body, while the other came from the victim's panty liner.

However, Duda did not simply "review" Cohen's report in the sense of reading it and noting its conclusions. Rather, Duda independently re-analyzed the significance of the test data that Cohen obtained from running the two samples through the ABI–310 Genetic Analyzer. Here is Duda's testimony on this point:

> *Duda:* [Jessica Cohen was] the person who went into the laboratory and actually put scalpel to swab and cut it [to prepare it for testing], but I did go through all of her electronic data. In other words, Jessica . . . ran these [samples] through the genetic analyzer, and then the genetic analyzer produced [the test] data. [My participation] began at the process of looking at the data she printed out [from the genetic analyzer].
>
> I made sure that, according to her bench notes, she followed the protocols that are standard for our laboratory. [In addition,] I [confirmed] that I came to the same [genetic] typing results that she did. And I also looked at those [genetic] typing results to form conclusions [about whether the DNA in those samples matched the

genetic profiles of the people involved in this case]. [I] made sure that [Jessica and I] came to the same conclusions [from] these tests.

. . .

*Prosecutor:* Once [the samples were] analyzed, did you review the [test data] that was obtained?

*Duda:* Yes, I did.

*Prosecutor:* Okay. And that was . . . to see if you drew the same conclusions?

*Duda:* That's right. To make sure that, from the point where the [ABI–310 Genetic Analyzer] spits out the data for us, . . . that the data [presented in Cohen's] report is consistent with [the machine's reading], and that the conclusions [she] reached [from that data] are correct.

Duda then testified that she "concurred with all the information in [Cohen's] report."

In particular, with regard to the sample obtained from the victim's panty liner, Duda testified that this sample did contain at least some male DNA, but the DNA obtained from this sample was insufficient for the genetic analyzer to produce data from many of the DNA strand locations that are used as test sites. The machine was able to identify the alleles at a few DNA locations, and all of these identified alleles were consistent with either Vann's genetic profile or the victim's genetic profile, but Duda testified that she "[couldn't] come to any more conclusions than that, because there just isn't enough information there." She then added, "I'm not calling this a match."

With regard to the sample obtained from the victim's body, the genetic analyzer was able to fully analyze the DNA from this sample. The testing yielded two genetic profiles—an "epithelial" profile obtained from outer body cells and a separate profile obtained from sperm cells.

Not surprisingly, the epithelial profile matched the victim's genetic profile. The sperm profile, Duda testified, was a complete match of Vann's genetic profile. Again, the chance that the genetic material found in the sperm sample came from someone other than Vann was less than one in 1 quintillion.

*The trial judge's ruling in response to Vann's confrontation clause objection*

Before Cheryl Duda took the stand, Vann's attorney objected to having Duda "testify to what [Jessica] Cohen did, and what [testing] results she turned in." The trial judge, Superior Court Judge Charles T. Huguelet, concluded that this issue was governed by Alaska Evidence Rule 703.

Evidence Rule 703 governs expert testimony: it allows a witness to offer an expert opinion based on underlying information or data that was "made known" to the expert, even if this information or data would not be independently admissible under the rules of evidence, so long as the information or data is "of a type reasonably relied upon by experts in [that] particular field [when] forming opinions or inferences upon the subject".

In other words, under Evidence Rule 703, the proponent of expert testimony need not show that the information or data that the expert is relying on could survive a hearsay objection or an objection based on the expert witness's lack of first-hand knowledge. *See* the fifth and sixth paragraphs of the Commentary to Alaska Evidence Rule 703; *Guerre–Chaley v. State,* 88 P.3d 539, 542 (Alaska App.2004).

Responding to the defense attorney's objection, Judge Huguelet stated that the determinative issue was whether Cohen's test results were "something that someone in [Duda's] field of expertise [would rely] on, routinely, to base their opinions". The judge then explained:

> *The Court:* If this is the type of fact or data that is reasonably relied upon by experts in Ms. Duda's field, then she should be able to testify to it. If it isn't, then she shouldn't. . . . I mean, if [this information is offered] as a basis for her opinion, the facts or data that she has relied on, then it would probably be admissible. [But] I'd have to hear it, you know. I can't predetermine [this question].

Vann's attorney argued that a normal Rule 703 analysis did not apply, because the State was not simply trying to introduce the facts or data underlying Duda's opinion. Rather, the defense attorney argued, the State was

really attempting to introduce one expert witness's findings (Cohen's findings) through the testimony of another expert witness (Duda):

> *Defense Attorney:* The problem is [that] the State is trying to [have] Ms. Duda testify [about] Ms. Cohen's work.... [T]he State wants ... Ms. Duda to be able to testify to what Ms. Cohen did, and then testify to what Ms. Cohen's results were. [Ms. Cohen's test was] a totally different test. That's [inadmissible] hearsay, and in violation of [Vann's] right to confront [his accusers]....
>
> There [were] two different tests, is what I'm saying. Two different tests were done by two different people.

Judge Huguelet reiterated his view that the issue was governed by Evidence Rule 703: "[Duda's testimony] needs to fit into [Rule] 703.... [If] her opinion ... [is] based on someone else's work, and that's what experts in [her] field rely on, then she should be able to ... disclose the underlying facts and data that she relies on."

As indicated by Judge Huguelet's remarks quoted above, the judge acknowledged that he did not yet have enough information to make a final ruling on the admissibility of Duda's proposed testimony—because Duda had not yet testified on the foundational question of whether Cohen's test results were the kind of information or data that experts in her field would rely on. Because of this, Judge Huguelet encouraged Vann's attorney to renew his objection if, later, the defense attorney concluded that Duda's testimony about the DNA testing performed by Cohen exceeded the scope of testimony permitted by Rule 703.

The defense attorney raised no further objection on this issue during Vann's trial.

*A more detailed look at the issue raised in this appeal*

As we just noted, the trial judge invited Vann's attorney to raise an objection if the defense attorney believed that Duda's testimony about the test results obtained by Cohen fell outside the scope of admissibility defined by Evidence Rule 703. The defense attorney never raised such an objection. And, on appeal, Vann does not argue that Duda's testimony exceeded the scope of Evidence Rule 703. Rather, Vann argues that it is irrelevant whether Duda's testimony was authorized by Evidence Rule 703—because, even if the challenged testimony was admissible under Rule 703, the admission of this testimony violated Vann's right of confrontation guaranteed by the Sixth Amendment.

Because Vann does not challenge the admissibility of Duda's testimony under Evidence Rule 703, he impliedly concedes that the test results obtained by Cohen were, in fact, the type of data that Duda (as a DNA analyst) would reasonably rely on when she formed an opinion as to whether Vann was potentially the culprit in this case.

Thus, Vann's appeal raises the issue of whether, or how, the confrontation clause of the Sixth Amendment limits the admissibility of evidence under Evidence Rule 703—*i.e.*, limits the admissibility of evidence that would otherwise be hearsay when that evidence is offered to explain the basis for an expert's opinion.

Both Alaska Evidence Rule 703 and the corresponding federal rule upon which it is based, Federal Evidence Rule 703,[2] were expressly intended to modify the common-law rules of evidence by allowing expert witnesses to offer opinions based on facts or data that are not independently admissible in evidence.[3] So long as the information is of a type reasonably relied on by experts in that field, the expert witness is permitted to testify concerning that information as a basis for their opinion.[4] As explained in the Commentary to Alaska Evidence Rule 703:

> [T]he rule is [premised on] the belief that when an expert is deemed skilled enough

---

**2.** See the first sentence of the Commentary to Alaska Evidence Rule 703.

**3.** Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (9th ed.2006), Vol. 3, p. 703–4.

**4.** *Ibid.*

to assist the trier of fact, the expert should be allowed to utilize the tools that he [or she] normally uses to practice his [or her] skills outside of the court. Thus, a physician [may base a] diagnosis on general information obtained from medical journals and treatises[,] . . . [on] statements by patients and relatives, [on] reports and opinions from nurses, technicians[,] and other doctors, [on] hospital records, and [on] x-rays.

Commentary to Alaska Evidence Rule 703, fifth paragraph.

The facts of *Meléndez–Díaz* did not raise this issue directly, because no laboratory analyst or other chemical identification expert took the stand in *Meléndez–Díaz*. Instead, the government relied on a procedure under Massachusetts law that allowed the government to introduce a sworn report prepared by the analyst who conducted the testing—a "certificate of analysis". In other words, *Meléndez–Díaz* involved a situation where hearsay evidence of the laboratory analysts' findings was the *only* evidence of the chemical composition of the substances in the defendant's possession.

Vann's case is different. To prove that Vann was the source of the genetic material retrieved from the victim's body and from various items connected to the crime, the State presented the testimony of Cheryl Duda, a DNA analyst employed by the State Crime Lab. Duda explained the testing procedures, she explained her analysis of the test results, and she was subject to cross-examination—thus apparently satisfying Vann's right of confrontation. But Vann argues that even though Duda took the stand at his trial, he was nevertheless denied his right to confront the other DNA analyst who worked on his case, Jessica Cohen.

Vann notes that, with respect to two of the five testing samples involved in this case (the sample obtained from the victim's panty liner, and the sample obtained from the victim's body), it was Cohen who "extracted the DNA, conducted the DNA analysis, and obtained and recorded the [test] results". Based on these circumstances, and based on the Supreme Court's decision in *Meléndez–Díaz*, Vann asserts that he had a right to confront Cohen, "the forensic analyst who actually performed the procedures and [the] tests" on these two samples.

Ever since the Supreme Court redefined the confrontation clause in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), courts have been struggling with the problem of how a defendant's right of confrontation affects or limits the government's presentation of expert opinion evidence in a criminal trial. The Supreme Court's decision in *Meléndez–Díaz* may have clarified this area of the law to some degree, but *Meléndez–Díaz* does not provide a ready answer to the question posed in Vann's case.

As we explained earlier, *Meléndez–Díaz* dealt with a situation at the far end of the confrontation spectrum. The government presented no live witness to establish that the substance in Meléndez–Díaz's possession was cocaine. Rather, the government relied on "certificates" prepared by laboratory analysts employed by the government. These certificates were terse: they "contained only the bare-bones statement that '[t]he substance [in Meléndez–Díaz's possession] was found to contain: Cocaine.'" *Meléndez–Díaz*, 129 S.Ct. at 2537. The certificates did not contain any explanation of the testing procedures that the analysts used, nor did the certificates recite the resulting test data upon which the analysts based their conclusions. *Ibid.*

In other words, to prove that Meléndez–Díaz possessed a controlled substance, the government relied on wholly conclusory written statements made by absent witnesses. When the case is viewed in this light, it is easy to agree with Justice Scalia's pronouncement that the Court's decision in *Meléndez–Díaz* was simply a "straightforward application of [the Court's] holding in *Crawford*". 129 S.Ct. at 2533.

So what were the points of contention in *Meléndez–Díaz*? The Court's decision is notable, not for the legal propositions that the Court adopted, but rather for the legal propositions that the Court rejected.

Most importantly, the Court rejected the argument that laboratory technicians or analysts are not "accusatory" witnesses, but are

instead disinterested scientific experts whose conclusions need not be subjected to the demands of the confrontation clause.

The Court pointed out that, in Meléndez–Díaz's case, the laboratory analysts provided the government's sole proof of an essential element of its case: proof that the defendant possessed cocaine. 129 S.Ct. at 2533–34. The fact that the government had police witnesses who could testify that Meléndez–Díaz possessed this substance would matter very little without the laboratory analysis of the substance.

The Court further pointed out that, even though the ideal laboratory technician or analyst might engage in "neutral, scientific testing", 129 S.Ct. at 2536, the reality was sometimes different. As the Court observed, "[f]orensic evidence is not uniquely immune from the risk of manipulation." *Ibid.* The Court noted that the majority of forensic laboratories in this country are administered by law enforcement agencies; thus, the technicians who work at these laboratories "may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution". *Ibid.*[5]

Nor is purposeful manipulation of test results the only danger. As the Court observed, the Sixth Amendment's right of confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well. . . . Like expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed on cross-examination." *Id.* at 2537.

The Court also rejected the argument, based on the Court's earlier decision in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), that a laboratory technician's out-of-court assertions are not covered by the confrontation clause because the technician is simply observing and recording "contemporaneous" or "near-contemporaneous" events—*e.g.*, a visible chemical reaction, or the reading displayed by a testing machine. *Meléndez–Díaz*, 129 S.Ct. at 2534–35.

The Court pointed out that, in *Davis* (actually, in the companion case of *Hammon v. Indiana*), the victim of a domestic assault gave an account of the crime to the police soon after the assault was committed; the victim's statement was sufficiently contemporaneous with the assault that the trial judge in that case ruled that this out-of-court statement qualified for admission as a statement of present sense impression. *Meléndez–Díaz*, 129 S.Ct. at 2535; *Davis*, 547 U.S. at 820, 126 S.Ct. at 2272. Nevertheless, the Supreme Court held that the admission of this statement, without the opportunity to cross-examine the person who made it, violated the confrontation clause. *Meléndez–Díaz*, 129 S.Ct. at 2535; *Davis*, 547 U.S. at 830–32, 126 S.Ct. at 2278–79.

More importantly, the *Meléndez–Díaz* Court pointed out that this supposed exception for witnesses who make "contemporaneous" observations would eliminate a defendant's right to confront a good deal of police testimony as well—for example, a police officer's on-the-scene description (spoken into a recording device, or contemporaneously jotted down in a notebook) of what the officer observed when he or she responded to a reported crime. 129 S.Ct. at 2535.

In sum, the Court in *Meléndez–Díaz* firmly rejected the contention that the confrontation clause somehow does not apply to testimony concerning the scientific testing and analysis of substances. However, the decision in *Meléndez–Díaz* does not provide firm guidance regarding the scope of the confrontation that is required when the government relies on evidence of scientific testing or analysis.

This question is a difficult one because many types of experts—not just DNA analysts, but also doctors, pathologists, serologists, and psychiatrists—routinely rely on

5. See, for example, the Associated Press story dated March 23, 2010, written by Jean Ortiz, reporting that the head of the Douglas County, Nebraska forensic crime scene investigation unit was convicted of evidence tampering for "plant[ing] blood from a slaying victim in a car linked to two innocent suspects[,] to bolster the case against them". The full text of this story is available at:

 http://seattletimes.nwsource.com/html/
 nationworld/2011417037_apuscsiblood
 evidence.html

the results of chemical, physical, or psychological testing performed by other people.

As we explained above, Evidence Rule 703 was expressly intended to allow such expert witnesses to offer opinions based on testing data generated by other people, and to allow the experts to explain their opinions to the trier of fact by openly referring to this testing data. And, as we also explained above, Vann essentially concedes that Duda's testimony concerning Cohen's test results was admissible under Rule 703 to explain the basis for Duda's expert conclusions.

The question posed in this appeal is whether, under *Meléndez–Díaz*, the Sixth Amendment right of confrontation limits the scope of expert testimony otherwise authorized by Evidence Rule 703 when this type of evidence is introduced by the government against the defendant in a criminal case.

### A survey of the case law on this issue

Several courts have already issued decisions addressing the relationship between the confrontation clause and the admissibility of expert testimony that rests on information or data provided or generated by other people. A good many of these court opinions have been issued within the last several months, in litigation prompted by the Supreme Court's decision in *Meléndez–Díaz*. But even before *Meléndez–Díaz*, several courts recognized that the Supreme Court's decision in *Crawford* potentially affected the admissibility of expert testimony when the expert's opinion is based on information or data obtained from other people.

Some of the pre-*Meléndez-Díaz* decisions are now questionable—most notably, the California Supreme Court's decision in *People v. Geier*, 41 Cal.4th 555, 61 Cal.Rptr.3d 580, 161 P.3d 104 (2007).

In *Geier*, the California court held that hearsay evidence of DNA test results was not "testimonial" for purposes of *Crawford*. 61 Cal.Rptr.3d at 620, 161 P.3d at 138. In reaching this conclusion, the California court heavily relied on two principles that were later rejected in *Meléndez–Díaz*: first, the notion that evidence of laboratory testing is not "accusatory", *Geier*, 61 Cal.Rptr.3d at 622, 161 P.3d at 140; and second, the notion that a laboratory analyst's report is merely a collection of "contemporaneous" observations, *Geier*, 61 Cal.Rptr.3d at 620–21, 161 P.3d at 139–140..

As one panel of the California Court of Appeal recently observed in *People v. Benitez*, 182 Cal.App.4th 194, 106 Cal.Rptr.3d 39 (2010), given the fact that both of these premises were expressly rejected by the United States Supreme Court in *Meléndez–Díaz*, "[r]eliance on *Geier* as authority for permitting a substitute witness to testify [about] otherwise inadmissible scientific reports would be misplaced." *Benítez*, 182 Cal. App.4th at 202, 106 Cal.Rptr.3d at 39, —— P.3d at ——.

In contrast to the California Supreme Court's decision in *Geier*, many courts (in decisions issued both before and after *Meléndez–Díaz* ) have recognized that hearsay testimony about the results of laboratory or other scientific testing can be "testimonial" hearsay for confrontation clause purposes— and, as a consequence, these courts have addressed the relationship between a defendant's confrontation rights and the admissibility of expert testimony under rules equivalent to our Evidence Rule 703.

We have examined many of these decisions, and the rule that emerges from them is essentially the rule stated by the Michigan Court of Appeals in a pre-*Meléndez-Díaz* decision, *State v. Lonsby*, 268 Mich.App. 375, 707 N.W.2d 610 (2005).

In *Lonsby*, the government called one serologist, Woodford, to testify about serum testing that had actually been conducted by another serologist, Jackson. As explained by the Michigan court, Woodford's testimony was basically a summary of Jackson's written report—and, for that reason, the Michigan court concluded that the presentation of Woodford's testimony violated the defendant's right of confrontation. 707 N.W.2d at 621. The Michigan court declared:

> The critical point [in our confrontation clause analysis] is the distinction between an expert who [offers] an opinion based in part on the work of others and an expert who merely summarizes the work of oth-

ers. . . . [O]ne expert cannot act as a mere conduit for the opinion of another.

*Lonsby,* 707 N.W.2d at 621 n. 12 (citation omitted).

Or, as recently stated by the North Carolina Court of Appeals in *State v. Conley,* unpublished, 2010 WL 157554, *5 (N.C.App. 2010),

> [I]f an expert is merely offering the opinion of another non-testifying expert via a testimonial document, the Confrontation Clause is [implicated], and the *Crawford* safeguard of . . . cross-examination applies. If [on the other hand] an expert is presenting an independent analysis, subject to the rigors of cross-examination on the expert's own thoughts and conclusions, then the Confrontation Clause is satisfied[.]

This theme—that the confrontation clause bars the government from calling an expert witness whose testimony is a mere "conduit" for the analysis and conclusions reached by another, absent expert witness—runs throughout the appellate decisions on this issue. And, with the exception of a group of California Court of Appeal decisions that still adhere to *Geier*,[6] this "conduit" limitation explains the results reached by the courts from other states.

In other words, when the government's expert is simply a conduit for an absent witness's analysis, courts find a violation of the confrontation clause; but when the government's expert offers their *own* analysis, based in part on test data obtained from other people, courts find that the confrontation clause is satisfied.

We have found several cases where courts concluded that a defendant's right of confrontation was denied when the live witness's testimony simply recapitulated (and sometimes vouched for) the analysis performed by an absent witness. *See Commonwealth v. Depina,* 456 Mass. 238, 922 N.E.2d 778, 787 (2010); *State v. Locklear,* 363 N.C. 438, 681 S.E.2d 293, 304–05 (2009); *State v. Galindo,* 683 S.E.2d 785, 787–88 (N.C.App.2009); *United States v. Tran,* 18 F.3d 1132, 1143 (4th Cir.1994) (sometimes erroneously referred to as *"United States v. Cuong"*).[7]

On the other hand, numerous courts have concluded that a defendant's right of confrontation is satisfied when an expert witness offers *their own* analysis or conclusion, even when that analysis or conclusion is based on test results derived from testing performed by someone else.

This principle has been applied in drug cases—that is, cases like *Meléndez–Díaz* where the government's case rested on identifying a particular substance or item as a controlled substance: *see Carolina v. State,* 302 Ga.App. 40, 690 S.E.2d 435, 436 (2010); *State v. Hough,* 690 S.E.2d 285, 290–91 (N.C.App.2010); *United States v. Turner,* 591 F.3d 928, 933–34 (7th Cir.2010); and *United States v. Moon,* 512 F.3d 359, 361–62 (7th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 40, 172 L.Ed.2d 19 (2008).

*Moon,* in particular, contains the most forthright presentation of this rule. The Seventh Circuit declared that a reviewing forensic chemist "[is] entitled to analyze the data . . . obtained [by another chemist]", that

---

**6.** *See, e.g., People v. Green,* unpublished, 2010 WL 822583, *3–4 (Cal.App.2010); *People v. Colón,* unpublished, 2010 WL 612245, *17–18 (Cal.App. 2010); *People v. Gutierrez,* 177 Cal.App.4th 654, 99 Cal.Rptr.3d 369, 375–78 (2009); *People v. Rutterschmidt,* 176 Cal.App.4th 1047, 98 Cal. Rptr.3d 390, 412–13 (2009).

*But see People v. Jones,* unpublished, 2010 WL 797605, *6–9 (Cal.App.2010), in which the court declared that it was following *Geier,* but the court abandoned *Geier's* rationale. Instead, the court re-interpreted *Geier* as standing for the rule that we adopt here—the rule that "a supervisor from a lab that conducted DNA tests can render her own independent opinion . . . based on the results of lab tests conducted by an analyst employed at the lab", so long as the supervisor is

"subject to full cross-examination by the defendant". *Jones,* 2010 WL 797605 at *8. This same re-interpretation of *Geier* was employed in *In re T.F.,* unpublished, 2010 WL 926069, *4 (Cal.App. 2010).

*And see People v. Lopez,* 98 Cal.Rptr.3d 825 (Cal.App.2009), and *People v. Dungo,* 176 Cal. App.4th 1388, 98 Cal.Rptr.3d 702 (2009), both holding that *Meléndez–Díaz* overruled *Geier.*

**7.** The defendant in this case was a doctor named Tran Trong Cuong. In Southeast Asian names, the family name comes first. Thus, the defendant was Dr. Tran, and the case name is properly *United States v. Tran.* However, several courts have cited this case as *"United States v. Cuong"*—interpreting the defendant's name as if it were a European name.

"the Sixth Amendment does not demand that a chemist or other testifying expert have done the lab work himself", and that instrument readouts are not testimonial "statements". 512 F.3d at 362.

Similarly, in cases where the trier of fact must ascertain the cause of someone's death, courts have allowed medical examiners to give their opinion concerning the cause of death even though that opinion was based on the physical observations and laboratory results of an autopsy performed by another person: see *United States v. De La Cruz*, 514 F.3d 121, 132–34 (1st Cir.2008); *People v. King*, unpublished, 2010 WL 98693, *3–6 (Mich.App.2010).

And finally, in cases like Vann's, where the government attempts to prove the identity of the culprit through DNA analysis, courts have allowed DNA analysts to give their opinion of the significance of DNA test results even when those test results were obtained from testing performed by another laboratory analyst: see *People v. Johnson*, 394 Ill.App.3d 1027, 333 Ill.Dec. 774, 915 N.E.2d 845, 851–55 (2009); *Pendergrass v. State*, 913 N.E.2d 703, 707–08 (Ind.2009); *People v. Dail*, 69 A.D.3d 873, 894 N.Y.S.2d 78, 80 (2010); *State v. Mobley*, 684 S.E.2d 508, 511–12 (N.C.App.2009); *State v. López*, 186 Ohio App.3d 328, 927 N.E.2d 1147, 1159 (Ohio App.2010); *United States v. Richardson*, 537 F.3d 951, 960 (8th Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2378, 173 L.Ed.2d 1299 (2009).

*Why we conclude that the admission of the challenged testimony did not violate Vann's right of confrontation*

■ If we analyze Vann's case under the rule discussed in the preceding section of this opinion—that is, if we draw the constitutional dividing line between expert testimony that is merely a "conduit" for someone else's analysis versus expert testimony in which the live witness offers their own independent analysis—then the testimony that Vann challenges in this appeal was properly admitted.

As explained above, during Cheryl Duda's testimony, she fully explained the DNA test-ing procedures employed by the State Crime Lab. In particular, Duda explained that the final stage of the testing process was to run the DNA sample through a machine—the ABI–310 Genetic Analyzer—that chemically "reads" the genetic contents of the DNA and produces a printout (in graph form) of the results. Using this graph, a DNA analyst will identify the particular alleles that are present in the tested DNA at particular locations (or will determine that it is impossible to ascertain the identity of the alleles at one or more specific locations). Then, armed with this knowledge, the DNA analyst will determine (1) whether the sample contains DNA from only one person, or more than one person, and (2) whether the genetic profile found in the DNA can be linked to the genetic profile of another DNA sample (in this case, the known samples obtained from Vann and from the victim).

Duda further testified that, with respect to the two DNA samples that were tested by Jessica Cohen, Duda checked Cohen's "bench notes" to make sure that Cohen followed the proper testing protocols when she prepared the samples for testing in the ABI–310 Genetic Analyzer. Duda then examined the test results themselves—the printed-out graphs produced by the ABI–310 Genetic Analyzer—to see if she came to the same conclusions that Cohen did with respect to (1) identifying the genetic profiles present in the two DNA samples, and (2) determining whether those genetic profiles matched either Vann or the victim.

Duda then described *her own* analysis of the printed-out test results from those two samples: her conclusion that the sample from the victim's panty liner failed to provide sufficient genetic information to establish a match with either Vann or the victim, but that the sperm sample from the victim's body was a complete match of Vann's genetic profile.

Given this record, it is clear that Duda was not merely the conduit for Cohen's opinion. Indeed, Cohen's opinion regarding the test results was mentioned only in passing. The jury would clearly understand that the opinions and analysis offered by Duda were her

own opinions and analysis, based on her independent examination of the test results produced by the ABI–310 Genetic Analyzer.

■ Because Duda's testimony is clearly admissible under the "conduit versus independent analysis" rule that we have derived from the case law, the sole remaining issue before this Court is whether we should follow this rule—in other words, whether this rule is consistent with the Supreme Court's decisions in *Crawford* and *Meléndez–Díaz.* It is true that a good number of appellate courts believe that this test is consistent with the Supreme Court's interpretation of the confrontation clause. But the fact that other courts believe this does not absolve this Court of our independent duty to assess the constitutionality of the test.

As we are about to explain, we conclude that the "conduit versus independent analysis" rule is consistent with the Sixth Amendment right of confrontation if—and only if—the rule is applied with due regard to the concerns that underlie the right of confrontation.

At the outset, we acknowledge that it may sometimes be difficult, in a particular case, to distinguish between expert testimony that is a "conduit" for someone else's analysis and expert testimony that presents the witness's own independent analysis. The label that a court attaches to the expert's testimony is, in fact, only a shorthand way of expressing the court's conclusion as to whether cross-examination of that one witness will satisfy the defendant's right of cross-examination, or whether (instead) the government must produce one or more additional witnesses. Thus, the correct categorization of a witness's testimony will necessarily hinge on the precise issues being litigated and the content of the witness's testimony.

We note that one of the Supreme Court's key concerns in *Meléndez–Díaz* was the possibility of mistaken, improper, or even fraudulent scientific testing. The Court cited one study of false convictions—that is, a study of cases in which exonerating evidence later showed that the defendant was improperly convicted—which concluded that "invalid forensic testimony contributed to [these false] convictions in 60% of the cases." 129 S.Ct. at

2537. As stated in Justice Scalia's lead opinion, "[c]onfrontation is designed to weed out [both] the fraudulent analyst [and] the incompetent one", and to reveal "an analyst's lack of proper training or deficiency in judgment". *Ibid.*

In explaining why Meléndez–Díaz had been denied his right of confrontation, Justice Scalia noted that the "certificates of analysis" introduced by the government "did not [reveal] what tests the analysts had performed, whether those tests were routine, and whether [the interpretation of] their results required the exercise of judgment or the use of skills that the analysts may not have possessed." *Ibid.* In addition, cross-examination could have illuminated the potential sources of error in either the testing procedures or the interpretation of the test results. 129 S.Ct. at 2537–38.

These, then, are the concerns that must be given paramount importance when a court applies the "conduit versus independent analysis" test. If this test is to lead to results that are consistent with the Sixth Amendment right of confrontation, a court must bear these concerns in mind when deciding whether an expert's testimony should be categorized as a "mere conduit" for another expert's analysis, or whether that testimony should be viewed as presenting the witness's independent analysis.

And, at least with regard to the situation presented in Vann's case—*i.e.,* cases where the government presents the testimony of a DNA analyst to establish the defendant's identity as the perpetrator of a crime—we disavow the suggestion found in some of the cases that a defendant has no right to confront the person who performed the DNA testing because the DNA test results are only being introduced to explain the basis for the DNA analyst's opinion, rather than being introduced for the truth of the matter asserted.

It is true, as a matter of technical evidence law, that when an expert testifies under the authority of Evidence Rule 703 about the underlying information or data that they have relied on to form their opinion, this underlying information or data need not be

independently admissible, and the expert's testimony about the factors underlying their opinion is not introduced for the truth of the matters asserted.[8] But, as a practical matter, there are times when the expert's opinion has essentially no probative value unless the jury assumes the truth of some or all of this underlying information or data. For this reason, when the underlying facts or data are not otherwise admissible, Evidence Rule 705(c) directs the trial judge to prohibit the expert from testifying about these underlying matters "if the danger that [the expert's testimony concerning these matters] will be used for an improper purpose outweighs their value as support for the expert's opinion".

According to the Commentary to Alaska Evidence Rule 705(c), the "danger" spoken of here is the danger that the jury "might ... use the facts or data as the basis for an independent judgment on issues in [the] case". In other words, the danger is that the jury will view the expert's testimony about these underlying facts or data as proof that this information is true, or that it was derived in a scientifically valid manner. *See Guerre–Chaley v. State*, 88 P.3d 539, 543–44 (Alaska App.2004).

This danger is especially acute in DNA analysis cases. It is true that one must have expertise to make an informed judgement as to whether there is a match between the genetic profile derived from testing an evidentiary sample and the genetic profile of a particular person (whether suspect or victim) derived from a known sample. But the real probative force of the expert's testimony hinges on the accuracy of the test results: if those test results are false or mistaken, then the expert's opinion as to whether those test results match the genetic profile of a particular person has essentially no value.

We now use these principles to re-examine the testimony given by Cheryl Duda in Vann's case.

As we noted earlier, Duda fully explained the DNA testing procedures employed by the State Crime Lab—the process of identifying one or more genetic profiles from a particular DNA sample. In particular, Duda explained that the final stage of the testing process was to run the DNA sample through a machine-the ABI–310 Genetic Analyzer— that chemically "reads" the genetic contents of the DNA and produces a printout (in graph form) of the results.

Duda explained how a DNA analyst uses this graph to identify the particular alleles that are present in the tested DNA at particular locations (or to determine that it is impossible to ascertain the identity of the alleles at one or more specific locations). Then, based on these test results, the DNA analyst will attempt to determine (1) whether the sample contains DNA from only one person, or more than one person, and (2) whether the genetic profile found in the DNA can be linked to the genetic profile of another DNA sample (in this case, the known samples obtained from Vann and from the victim).

In particular, Duda testified that after she obtains the print-outs from the ABI–310 Genetic Analyzer, she uses these graphs to identify the genetic profiles contained in the DNA samples, and then she compiles this information in a chart that allows her to compare the genetic profiles and "make [her] interpretations". Duda explained that it was important for her to preserve the graph results from the Genetic Analyzer, as well as the chart summarizing those graphs, so that a second DNA analyst could review her work and independently decide whether she had accurately interpreted the test results. Duda described this peer review process as "absolutely essential in our laboratory".

After Duda testified about her analysis of the three DNA samples that she personally tested, Duda then turned to the two samples that her colleague Jessica Cohen tested. Duda explained that she had seen (and had signed) Cohen's report before it left the lab, because she was the peer reviewer of Cohen's results. Duda testified that she examined the report to make sure that there was no indication that Cohen had deviated from the Crime Lab's testing protocols. Then

---

8. *See Guerre–Chaley v. State*, 88 P.3d 539, 541–42 (Alaska App.2004); *Broderick v. King's Way As-* *sembly of God*, 808 P.2d 1211, 1216 (Alaska 1991).

Duda "[went] through all of [Cohen's] electronic data"—that is, the printed-out test results from the ABI–310 Genetic Analyzer—and "made sure that [she, *i.e.*, Duda] came to the same [genetic] typing results that [Cohen] did".

Duda explained that her peer review of Cohen's analysis was structured in such a way as to produce a second, independent analysis of the machine results—that the Crime Lab's review procedures were designed "to make sure that each of us comes up with the same findings [independently]" before a DNA analysis report is approved for release. For that reason, Duda independently assessed Cohen's work product "from the point where the instrument spit[ ] out the data for us".

Duda then described her own analysis of the printed-out test results from the two samples that Cohen tested. Duda testified that, in her opinion, the sample from the victim's panty liner failed to provide sufficient genetic information to establish a match with either Vann or the victim, but that the sperm sample from the victim's body was a complete match of Vann's genetic profile.

Given this record, we conclude that the State was not required to present Jessica Cohen as a witness, and that Vann's right of confrontation was satisfied when he was given the opportunity to cross-examine Cheryl Duda. By cross-examining Duda, Vann had a fair opportunity to explore the type of testing that was performed and the procedures that were used in that testing. This cross-examination also gave Vann the opportunity to identify or highlight any potential sources of error in the testing and any potential for misinterpretation of the test results. Finally, and perhaps most important, it was clear from Duda's testimony that the opinions and conclusions she offered to the jury were *her own* interpretation of the printed test results produced by the machine.

■ It is true that, with regard to Cohen's preparation of the DNA sample and Cohen's act of placing or introducing that sample into the ABI–310 Genetic Analyzer, all that Duda could say was that Cohen's "bench notes" showed no deviation from the Crime Lab's protocols. There was the potential, at least,

that Cohen had either inadvertently or intentionally deviated from the prescribed protocols, but then had written her bench notes as if the proper procedures had been followed.

We do not say that this possibility of testing error should be ignored, or that it is necessarily insignificant. But we believe that this is the type of problem that the *Meléndez–Díaz* court intended to cover in footnote 1 of its opinion:

> Contrary to the dissent's suggestion, *post*, [129 S.Ct.] at 2544–2545, 2546 (opinion of Kennedy, J.), we do not hold ... that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "[i]t is the obligation of the prosecution to establish the chain of custody," *post*, at 2546, this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, *ibid.*, from *United States v. Lott*, 854 F.2d 244, 250 (C.A.7 1988), "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records. See *infra*, at 2550–2551, 2552.

*Meléndez–Díaz*, 129 S.Ct. at 2532 n. 1 (emphasis in the original).

■ In other words, there is always the possibility that, during the procedures leading up to the actual testing of a DNA sample in the ABI–310 Genetic Analyzer (or equivalent device), the sample was misidentified or contaminated or improperly prepared for testing. But these matters fall within the rubric of Evidence Rule 901(a), which requires the authentication of physical evidence in criminal cases if that evidence is "susceptible to adulteration, contamination, modification, tampering, or other changes in form

attributable to accident, carelessness, error[,] or fraud". (This requirement is often referred to as "chain of custody".)

As noted in the *Meléndez–Díaz* footnote, and as confirmed by Alaska cases on this subject, Evidence Rule 901 does not require the State to bring forward every witness who had custody of, or contact with, the physical evidence in question, nor does it require the State to affirmatively negate every conceivable possibility of mishandling or tampering.[9] Under Alaska case law, the State's failure to produce Jessica Cohen as a witness to describe her handling and preparation of the DNA sample might affect the weight or credibility of Duda's analysis of the test results, but it does not bar the admission of Duda's testimony on this subject. And we interpret the *Meléndez–Díaz* footnote to mean that the confrontation clause did not require the State to produce Jessica Cohen to testify about her pre-testing handling and preparation of the DNA sample, so long as the *analysis* of the test results was performed by Duda, a witness who did appear before the trier of fact and was subject to cross-examination.

*Whether the prosecutor's comment on Vann's refusal to voluntarily submit to a physical examination requires reversal of Vann's convictions*

 Vann raises one additional claim of error. In the prosecutor's opening statement at Vann's trial, the prosecutor told the jury that, during the investigation of the case, the State obtained two search warrants—one warrant to search Vann's vehicle, and the other warrant requiring Vann to submit to a physical examination for evidence pertinent to a charge of sexual assault. The prosecutor then added that Vann had refused to go with the state troopers to submit to the physical examination until he was served with the warrant:

> *Prosecutor:* You're going to hear that Mr. Vann, even with the assurances of [two state troopers, who] told him what was going on—there's a sexual assault investigation in Seward, they'd like you to come

down for this examination—and ... he repeatedly refused to [go with them] until it essentially got down to the point where he's confronted with ... a court order that says you have to do it, and you will go. And eventually he does go, after repeated refusals to submit to [the] examination.

Vann's attorney did not object to the prosecutor's comments at the time, and the trial judge did not *sua sponte* caution the prosecutor or issue a curative instruction.

This issue arose again during the testimony of the principal investigating officer. On cross-examination, Vann's attorney had the officer confirm that he obtained a search warrant to gather bodily evidence from Vann, and that obtaining a warrant in cases like this was routine. On redirect, the prosecutor tried to elicit testimony that the police do not always need to get a warrant—that sometimes an individual who is under investigation will cooperate and voluntarily submit to an examination without a warrant.

Specifically, the prosecutor attempted to ask the officer, "[I]n fact, you don't always have to get a warrant, right? If the individual...." But before the prosecutor could finish this question, Vann's attorney objected. A largely indiscernible bench conference ensued. When the bench conference concluded, the prosecutor announced that he had no further questions for the officer.

Later, just before the testimony of a state trooper involved in the investigation, the prosecutor informed the trial judge that he intended to ask the trooper whether Vann voluntarily submitted to the physical exam. The prosecutor argued that Vann's refusal to submit voluntarily was relevant because it demonstrated his "consciousness of guilt". Vann's attorney again objected, and the trial judge sustained the defense attorney's objection; that is, the trial judge barred the prosecutor from asking the trooper about Vann's refusal to submit to the physical examination voluntarily. The judge ruled that this proposed testimony would infringe Vann's Fifth Amendment rights, and that any potential

9. *See, e.g., Wright v. State,* 501 P.2d 1360, 1372 (Alaska 1972); *Houston–Hult v. State,* 843 P.2d 1262, 1266–67 (Alaska App.1992).

probative value of this evidence was outweighed by its potential for unfair prejudice.

On appeal, Vann argues that his conviction should be reversed because of the prosecutor's comment during opening statement that Vann declined to submit to a physical examination until he was confronted with the search warrant. Vann concedes that when the prosecutor attempted to introduce this fact into evidence (through the testimony of the two law enforcement officers), the trial judge sustained both of Vann's objections and refused to let the prosecutor elicit this testimony. Vann further concedes that he made no objection when the prosecutor mentioned this matter in his opening statement. Vann nevertheless argues that his conviction must be reversed because the trial judge "never directed the jury not to consider the [prosecutor's comment] in ... opening statement that Mr. Vann did not submit voluntarily to the exam".

Because Vann's attorney made no objection to the challenged remark, Vann must now show plain error. Vann has satisfied the first part of the test for plain error: it was plainly improper for the prosecutor to ask the jury to infer Vann's guilt from the fact that Vann insisted on his right not to voluntarily cooperate in the physical examination that the police wished to conduct.[10]

But the obviousness of the error cuts both ways here. As we have explained, the defense attorney objected both times when the prosecutor attempted to elicit testimony (through the two law enforcement officers) of Vann's refusal to voluntarily submit to the examination. This shows that the defense attorney was well aware of the law on this point; in other words, the error was obvious to him.

After the trial judge sustained the defense attorney's objections, it was clear that the trial judge concurred with the defense attorney that this sort of evidence was not admissible. At that point, the defense attorney

might have sought to remedy the objectionable portion of the prosecutor's opening statement by asking the trial judge to give a curative instruction to the jury: an admonition that Vann had a constitutional right to insist on a warrant before he submitted to the physical examination, and that it would be improper for the jury to draw any adverse inference from the fact that Vann chose to exercise this right.

But Vann never asked the trial judge for this type of instruction, or for any other relief to cure the prosecutor's improper remarks during opening statement. Instead, Vann waited until this appeal to present this claim as a reason to reverse his convictions.

Under Alaska law, when a defendant presents a claim of plain error, the defendant must negate the possibility that their attorney's failure to make a timely objection in the trial court was the product of a tactical decision.[11] Moreover, when the record is silent or ambiguous on this point, courts apply a presumption that the defense attorney's action (or, more precisely, inaction) was tactical.[12]

As we noted earlier, Vann's attorney elicited testimony from the State's lead investigator that it was routine to get a search warrant for a physical examination in cases like this, and the defense attorney prevented the prosecutor from eliciting evidence that suspects often voluntarily submitted to such examinations. The defense attorney may have concluded that this was a sufficient response to the false step in the prosecutor's opening statement.

In addition, as we have also noted, there is a distinct possibility that the defense attorney made a tactical decision to refrain from asking the trial judge for a cautionary instruction or some other type of relief.

We do not draw this inference from the fact that the defense attorney failed to ob-

**10.** See *Padgett v. State,* 590 P.2d 432, 434–35 (Alaska 1979); *Bargas v. State,* 489 P.2d 130, 132 (Alaska 1971).

**11.** *Henry v. State,* 861 P.2d 582, 589 (Alaska App.1993), citing *Massey v. State,* 771 P.2d 448, 453 (Alaska App.1989) ("unless the record precludes the possibility that counsel's actions may have been tactical, a finding of plain error is rarely appropriate").

**12.** *Massey v. State,* 771 P.2d 448, 453 (Alaska App.1989).

ject when the prosecutor made the improper comment during his opening statement. Rather, the inference of tactical choice arises from occurrences later at Vann's trial. As we have explained, when the prosecutor attempted to introduce evidence of Vann's refusal to voluntarily submit to the examination, the defense attorney immediately objected and was successful (twice) in blocking the State from introducing this evidence. This shows that the defense attorney was well aware that this evidence was improper, and that the attorney was quite capable of asserting Vann's rights on this issue.

One might suppose that the defense attorney, having twice blocked the prosecutor's efforts to introduce testimony on this point, would then ask the trial judge to take action to remedy the fact that the prosecutor had promised during his opening statement to produce this evidence. And, as we have explained, the problem was seemingly easy to cure with a jury instruction. Given these circumstances, the defense attorney's failure to seek relief from the trial judge could well have been tactical: either the defense attorney decided that it would be counter-productive to ask the trial judge to take action that would remind the jurors of the objectionable portion of the prosecutor's opening statement, or the defense attorney conceivably chose to leave this issue on the table as a potential ground for appeal, rather than asking the trial judge to take curative measures before the case was submitted to the jury.

Moreover, we conclude that Vann has failed to satisfy the final element of a claim of plain error: proof that the error was so manifestly prejudicial to the fairness of the trial that failure to correct the error would perpetuate manifest injustice.[13]

Here, the error consists of a small portion (two sentences) of a lengthy opening statement that was merely the opening act of an eight-day trial. When the prosecutor attempted to introduce evidence to support this statement, the defense successfully blocked the attempt. Thus, the jury heard no evidence that Vann had declined to submit to the examination, and the prosecutor did not mention this subject during his summation to the jury at the end of the trial.

Moreover, the jurors were instructed (in Jury Instruction 37) to disregard the factual assertions of counsel to the extent that those assertions were not supported by the evidence:

> [A]rguments of counsel are not evidence and cannot be considered as such. It is your duty to give careful attention to the arguments of counsel, if they are based upon the evidence and upon the law as given to you by me in these instructions. But arguments of counsel, if they depart from the facts or from the law, should be disregarded.

Vann argues that even though the trial judge sustained his objection to the prosecutor's uncompleted question, "[I]n fact, you don't always have to get a warrant, right? If the individual . . . .", the jurors nevertheless *heard* the prosecutor's incomplete question, and thus the jurors would have assumed (from the prosecutor's words) that defendants sometimes voluntarily submit to this type of examination.

But Vann's argument ignores the fact that the trial judge gave a cautionary instruction to the jurors addressing this very issue. That instruction read: "When I sustain an objection to a question addressed to a witness, you must disregard the question entirely, and may not draw any inference from the wording of it, nor speculate as to what the witness would have said if permitted to answer the question."

For all of these reasons, we conclude that the prosecutor's comment, albeit improper, does not rise to the level of plain error, and thus does not require reversal of Vann's convictions.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**13.** *See Hosier v. State,* 1 P.3d 107, 112 (Alaska App.2000); *Potts v. State,* 712 P.2d 385, 390 (Alaska App.1985); *Roberts v. State,* 680 P.2d 503, 507 (Alaska App.1984).