NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Belknap
No. 2017-0104


THE STATE OF NEW HAMPSHIRE

v.

BRIAN A. WATSON

Argued: February 28, 2018
Opinion Issued: May 1, 2018


Gordon J. MacDonald, attorney general (Elizabeth C. Woodcock, assistant attorney general, on the brief and orally), for the State.

Sisti Law Offices, of Chichester (Mark L. Sisti on the brief and orally), for the defendant.


LYNN, C.J. The defendant, Brian A. Watson, appeals his conviction by a jury for felony sale of a controlled drug with death resulting. See RSA 318-B:26, IX (2017) (amended 2017). On appeal, he argues that the Superior Court (O'Neill, J.) erred by: (1) denying his motion to suppress statements allegedly obtained in violation of his Miranda rights, see Miranda v. Arizona, 384 U.S. 436 (1966); and (2) allowing a forensic toxicologist, Dr. Daniel Isenschmid, to testify to the results of toxicology tests that he did not conduct. We affirm.

I

A

Because the defendant has not provided, as part of the appellate record, the transcript of the evidentiary hearing held on his motion or all of the exhibits entered at that hearing, we must assume that the evidence was sufficient to support the trial court's denial of his motion to suppress, and we review its decision only for errors of law. See State v. Woods, 139 N.H. 399, 403 (1995). Accordingly, we accept the following facts recited by the trial court in its order as true.

The defendant was stopped while driving in Tilton and arrested on an active warrant for sale of a controlled drug. One of the arresting detectives told the defendant that he was going to read him his constitutional rights and then did so using a "Miranda Warning" card. See Miranda, 384 U.S. at 467-73. The card contained a list of five individual rights, and the detective read the defendant each right, one at a time. After reading each right to the defendant, the detective asked him if he understood the right that had been read. The defendant indicated that he understood each right. A second detective then informed the defendant that the police were aware that he had picked up drugs in Manchester earlier that day. The second detective asked the defendant whether his vehicle contained any drugs. The defendant indicated that he was unemployed and was temporarily selling drugs to make ends meet. Neither detective had the defendant complete or sign a waiver of rights form.

The defendant was then transported to the police station. While the defendant was being booked, one of the detectives asked him whether he wanted to speak with the police. At first, the defendant said that he "wasn't sure." A few moments later, the detective again asked the defendant whether he wanted to speak with the police, and he agreed to do so.

The detectives then brought the defendant into a small interview room containing a table and three chairs. The defendant was not handcuffed during the interview and did not seem overly emotional or angry. The detectives estimated that no more than 30 minutes elapsed between the defendant's initial arrest and the police station interview. The interview lasted approximately 30 minutes.

The interview began with the following exchange:

[Detective]: Brian, you are here at the police department. You are in custody. You were arrested today for sales of a controlled drug. You were arrested on the side of the road. During that time, . . . I did go over your constitutional rights with you, correct?

2

DEFENDANT: Yes.

[Detective]: Okay, and you understood all of those rights at the time?

DEFENDANT: Yeah.

[Detective]: And understanding those rights, you're willing to sit here and hear what we have to say, correct?

DEFENDANT: Yep.

[Detective]: Okay.

At first, the interview focused upon the sale of a controlled drug charge. During this part of the interview, the defendant made several potentially inculpatory statements regarding that charge. However, midway through the interview, the detective showed the defendant a photograph of a dead body and indicated that the police had evidence that the individual had died as a result of drugs that the defendant had sold to him. The rest of the interview focused upon the defendant's potential involvement in the individual's death. During this part of the interview, the defendant made several inculpatory statements regarding the sale of a controlled drug with death resulting charge. He was arrested on that charge after the interview concluded.

B

On appeal, the defendant argues that the trial court erred by failing to suppress his inculpatory statements because, he contends, they were obtained in violation of his Miranda rights. In so arguing, the defendant invokes his state and federal constitutional rights against compelled self-incrimination. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

The New Hampshire Constitution guarantees a criminal defendant protection from compelled self-incrimination. State v. Roache, 148 N.H. 45, 48 (2002); see N.H. CONST. pt. I, art. 15. Although neither the Federal nor the State Constitution requires "any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation," both the United States Supreme Court and this court have developed rules for safeguarding that privilege. Roache, 148 N.H. at 48 (quotation omitted). "Thus, when a person is taken into custody or deprived of his freedom in any significant way, and prior to interrogating him, the police must tell him that he has a right to remain silent, that anything he says can and will be used against

3

him, and that he has a right to counsel." Id.; see Miranda, 384 U.S. at 467-73. If the person asserts any of those rights, all questioning must cease. Roache, 148 N.H. at 48; see Miranda, 384 U.S. at 473-74.

"While these so-called Miranda warnings are not themselves rights protected by the Constitution, they are procedural safeguards necessary to dissipate the atmosphere of compulsion inherent in a custodial interrogation." Roache, 148 N.H. at 48 (quotation and citation omitted); see Miranda, 384 U.S. at 467. Accordingly, "[b]efore a statement can be admitted into evidence, the State has the burden of proving beyond a reasonable doubt that the defendant was apprised of his or her constitutional rights and that the subsequent waiver was voluntary, knowing and intelligent." State v. Pyles, 166 N.H. 166, 168 (2014) (quotation omitted).

The defendant first asserts that the trial court erred when it found that he voluntarily, knowingly, and intelligently waived his Miranda rights. A waiver need not be express to be valid. State v. Duffy, 146 N.H. 648, 650 (2001). "Rather, we must ascertain whether, under the totality of the circumstances, the defendant's understanding of his rights coupled with his conduct supports the trial court's ruling that he otherwise voluntarily, knowingly, and intelligently waived his rights beyond a reasonable doubt." Id. (quotation omitted). "[W]e will not reverse the trial court's finding on the issue of waiver unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." Pyles, 166 N.H. at 168 (quotation omitted).

Viewing the evidence in the light most favorable to the State, we conclude that the trial court's determination that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights is not contrary to the manifest weight of the evidence. See id. The defendant was twice asked whether he understood his Miranda rights, and both times he indicated that he did. See State v. Gravel, 135 N.H. 172, 178 (1991) (observing that although the defendant appeared to understand his rights and that although he acknowledged them, he was never asked whether he understood them). He was first asked while he was still on the side of the road. At that time, before any questioning had taken place, the defendant was read each of his Miranda rights and, after each right was read, was asked whether he understood the right in question. The defendant indicated that he did. Later, at the police station, before he was interviewed, the defendant was reminded that he had been read his rights and was again asked if he understood them. Again, the defendant indicated that he did.

Moreover, before he was interviewed, the defendant was asked three times whether he wanted to speak with the police. Although during booking he said that he "wasn't sure," the defendant affirmatively agreed to speak to the

4

police before they brought him into the interview room and again once he was in the interview room. Although the defendant was not expressly asked whether he "waived" his Miranda rights, see id., he was asked whether, "understanding [his constitutional] rights," he was "willing to sit [there] and hear what [the police had] to say," to which the defendant responded, "Yep." The totality of these circumstances supports the trial court's determination that the defendant waived his Miranda rights voluntarily, knowingly, and intelligently. See State v. Plante, 133 N.H. 384, 386-87 (1990) (determining that, although the defendant was not asked whether he "waived" his Miranda rights, his responses and agreement to talk supported the trial court's ruling that he implicitly waived those rights). Because the Federal Constitution affords the defendant no greater protection than does the State Constitution under these circumstances, we reach the same result under the Federal Constitution as we do under the State Constitution. Compare Pyles, 166 N.H. at 168 (holding that the State must prove, beyond a reasonable doubt, that the defendant's Miranda waiver was voluntary, knowing, and intelligent), with Colorado v. Connelly, 479 U.S. 157, 168 (1986) (holding that "the State need prove [Miranda] waiver only by a preponderance of the evidence").

The defendant next argues that the trial court erred because it failed to find that his "right to cut off questioning was not scrupulously honored in this case, as required under Miranda." In Miranda, the Supreme Court held that, if an accused is in police custody, has been informed of his Miranda rights, and "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. In a later case, Michigan v. Mosley, 423 U.S. 96 (1975), the Court explained that a defendant's expression of his desire to remain silent does not "create[ ] a per se prohibition on all future questioning," State v. Laurie, 135 N.H. 438, 441 (1992). Rather, "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his right to cut off questioning was scrupulously honored." Mosley, 423 U.S. at 104 (quotations omitted); Laurie, 135 N.H. at 442 (deciding under the State Constitution that "whenever a suspect in custody exercises his option to cut off questioning, the police must scrupulously honor the suspect's desire to remain silent").

In the context of the Miranda right to counsel, the Supreme Court has held that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Davis v. United States, 512 U.S. 452, 461 (1994). In so holding, the Court has explained that the determination of "whether the accused actually invoked his right to counsel" is based upon an objective inquiry. Id. at 458-59 (quotation omitted). "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police

5

officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459 (quotation and citation omitted). But, "[i]f an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (quotation and citation omitted).

In Berghuis, the Court held that the same standards apply "for determining when an accused has invoked the Miranda right to remain silent." Id.; see State v. Lynch, 169 N.H. 689, 699-700 (2017) (adopting Berghuis under the State Constitution). Thus, as with the Miranda right to counsel, to invoke the Miranda right to silence, an accused must do so unambiguously. Berghuis, 560 U.S. at 381-82.

In this case, the defendant concedes that he "never expressly said he wanted to quit the interview," but asserts that his "conduct indicated that he was not comfortable speaking about the death of [the victim]." He contends that, in the face of his "obvious apprehension at going forward" with the interview, the detectives "spoke to him in a way designed to pressure him into continuing to speak" and, thereby, disallowed him from "stop[ping] the interview."

We are not persuaded. See id. at 381. The defendant neither said that he wanted to remain silent nor that he did not want to speak with the police. See id. at 382. "Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." Id. (quotation omitted). "Here he did neither, so he did not invoke his right to remain silent." Id. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution under these circumstances, see Lynch, 169 N.H. at 700; Berghuis, 560 U.S. at 381-82, we reach the same result under the Federal Constitution as we do under the State Constitution.

II

A

The defendant next asserts that he was denied his right to confront witnesses against him as guaranteed by Part I, Article 15 of the State Constitution and the Sixth Amendment to the Federal Constitution "when the State presented results from the testing performed on [the victim's] blood [and urine] through . . . Isenschmid, who did not participate in such testing." See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. VI, XIV. He argues that, to satisfy his constitutional right to confront the witnesses against him, the State should have produced "the analyst(s) who actually conducted the tests." We

6

review Confrontation Clause challenges de novo.  State v. McLeod, 165 N.H. 42, 47 (2013).

Because the defendant has raised his claim under both the State and Federal Constitutions, ordinarily, we would first address his State claim.  See Ball, 124 N.H. at 231-33.  However, although the defendant invokes the Confrontation Clauses of both the State and Federal Constitutions, his argument relies upon his rights under the Federal Constitution: he contends that allowing Isenschmid "to testify about the results of tests performed on [the victim's] blood and urine instead of requiring the analysts who actually conducted and/or supervised the testing to do so" was contrary to Crawford v. Washington, 541 U.S. 36 (2004), and its progeny, Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. 647 (2011).  We have not adopted the Crawford analysis under the State Constitution, and the defendant does not argue that we should do so now.  See State v. Maga, 166 N.H. 279, 282 (2014).  Nor does he address the applicability of the Confrontation Clause test we have adopted — namely, that of Ohio v. Roberts, 448 U.S. 56, 66 (1980), overruled by Crawford, 541 U.S. at 68.  Id. We will not consider the admissibility of Isenschmid's testimony "under a standard the defendant has not argued."  State v. Brooks, 164 N.H. 272, 282 (2012).  Accordingly, we conclude that the defendant has not established that admitting Isenschmid's testimony violated his rights under Part I, Article 15 of the New Hampshire Constitution.  See id.; see also Maga, 166 N.H. at 282-83. We turn, therefore, to the defendant's argument under the Federal Constitution.  See Maga, 166 N.H. at 283.

B

The Sixth Amendment to the Federal Constitution provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States."  Michigan v. Bryant, 562 U.S. 344, 352 (2011).

In Roberts, the United States Supreme Court held that the Confrontation Clause does not bar admission of an unavailable witness's statement against a criminal defendant if the statement fit "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."  Roberts, 448 U.S. at 66.  The Court overruled Roberts in Crawford, 541 U.S. at 68.  "In Crawford, . . . the Supreme Court established a new constitutional baseline: admitting testimonial statements of a witness not present at trial comports with the Sixth Amendment only where the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine the declarant."  United States v. Ramos-Gonzàlez, 664 F.3d 1, 4 (1st Cir. 2011) (quotations, footnote, ellipsis, and brackets omitted); see Crawford, 541 U.S. at 59.  Although the

7

Court did not define what constitutes a "testimonial" statement, it identified certain "formulations of [the] core class of 'testimonial' statements," such as

> ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Crawford, 541 U.S. at 51-52 (quotations, ellipsis, and citations omitted).

Since Crawford, the Supreme Court has released three decisions addressing the application of the Confrontation Clause to forensic-testing evidence. They are Melendez-Diaz, 557 U.S. 305; Bullcoming, 564 U.S. 647; and Williams v. Illinois, 567 U.S. 50 (2012) (plurality opinion). In Melendez-Diaz, the trial court admitted into evidence three "certificates of analysis" setting forth "the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." Melendez-Diaz, 557 U.S. at 307, 308 (quotation omitted). The trial court admitted the notarized certificates, without live testimony, "pursuant to state law as prima facie evidence of the composition, quality, and the net weight of the narcotic analyzed." Id. at 309 (quotation and ellipsis omitted). After he was convicted, the defendant appealed, arguing "that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him." Id.

In a five-to-four decision, the Court reversed the defendant's conviction, holding that the notarized certificates fell "within the core class of testimonial statements" because they were "quite plainly affidavits: declarations of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Id. at 310 (quotations and brackets omitted). The Court explained: "The fact in question is that the substance found in the possession of Melendez-Diaz . . . was, as the prosecution claimed, cocaine—the precise testimony the analysts would be expected to provide if called at trial. The 'certificates' are functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." Id. at 310-11 (quotation omitted). Thus, "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [he] was entitled to be confronted with the analysts at trial." Id. at 311 (quotation and emphasis omitted).

8

In a footnote, the Court clarified that it did "not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." Id. at 311 n.1. The Court stated that its decision does not require "that everyone who laid hands on the evidence must be called." Id. Rather, "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." Id. (quotation and brackets omitted).

In Bullcoming, another five-to-four decision, the Court considered

> whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact— through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification.

Bullcoming, 564 U.S. at 652. In that case, the defendant was arrested on charges of driving while under the influence of intoxicating liquor; police investigators obtained a sample of his blood and forwarded it to the state laboratory. Id. at 652-53. Laboratory analysts used gas chromatograph machines to determine blood alcohol concentration (BAC) levels. Id. at 654. The analyst who tested the defendant's blood sample and recorded his BAC level also completed and signed the "certificate of analyst," in which he affirmed, among other things, that the sample was received with its seal intact and that he had followed certain procedures. Id. at 653 (quotation omitted). That analyst was not a witness at trial, however. Id. at 655. Rather, the government proposed to introduce his report as a business record during the testimony of a different laboratory scientist who had neither observed nor reviewed the work of the certifying analyst. Id.

Following the defendant's appeal, the state supreme court ruled that, although the BAC report qualified as testimonial evidence, its admission did not violate the Confrontation Clause because: (1) the certifying analyst "simply transcribed the results generated by the gas chromatograph machine"; and (2) the testifying scientist qualified as an expert with regard to that machine. Id. at 657 (quotation omitted). The state supreme court ruled that the defendant's right of confrontation was preserved because the testifying scientist "serv[ed] as a surrogate" for the certifying analyst. Id.

The Supreme Court reversed, concluding that the state supreme court had erred when it "permitted the testimonial statement of one witness . . . to enter into evidence through the in-court testimony of a second person." Id. at 658. The Court explained that the surrogate witness did not satisfy

9

Confrontation Clause requirements because the BAC report "reported more than a machine-generated number." Id. at 659-60. Rather, the report contained the certifying analyst's representations (that the blood sample was intact, that proper procedures were followed, and that the analysis was valid), which were proper subjects for cross-examination. Id. at 660. The Court determined that "surrogate testimony of the kind [the testifying scientist] was equipped to give could not convey what [the certifying analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." Id. at 661-62 (footnotes omitted). "In short," the Court concluded, "when the State elected to introduce [the certifying analyst's] certification, [the certifying analyst] became a witness [the defendant] had the right to confront." Id. at 663.

The Court also concluded that, even though the laboratory report in Bullcoming was not notarized, it resembled the reports in Melendez-Diaz "[i]n all material respects," and, like those reports, constituted testimonial evidence. Id. at 664-65. The Court held that the fact that the laboratory report in Bullcoming was not notarized "does not remove [it] from Confrontation Clause governance." Id. at 665.

Justice Sotomayor wrote a separate concurring opinion, emphasizing "the limited reach" of the majority opinion. Id. at 668 (Sotomayor, J., concurring). Her concurrence described "some of the factual circumstances that [Bullcoming] does not present":

> First, this is not a case in which the State suggested an alternative purpose, much less an alternative primary purpose, for the BAC report. . . .

> Second, this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. [The testifying scientist] conceded . . . that he played no role in producing the BAC report and did not observe any portion of . . . the testing. . . . It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. We need not address what degree of involvement is sufficient because here [the testifying scientist] had no involvement whatsoever in the relevant test and report.

> Third, this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence. . . . [The

10

testifying scientist did not] offer[ ] an independent, expert opinion about [the defendant's] [BAC]. . . .

> Finally, this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph. The State here introduced [the certifying analyst's] statements, which included his transcription of a [BAC], apparently copied from a gas chromatograph printout, along with other statements about the procedures used in handling the blood sample. Thus, we do not decide whether . . . a State could introduce (assuming an adequate chain of custody foundation) raw data generated by a machine in conjunction with the testimony of an expert witness.

Id. at 672-74 (citations omitted). Justice Sotomayor also reiterated that Melendez-Diaz did not stand for the proposition that "every person noted on the BAC report must testify." Id. at 670-71 n.2.

More recently, the Court decided Williams, which involved a DNA profile produced by a private laboratory. Williams, 567 U.S. at 56. The profile produced by the private laboratory had "matched a profile" produced by the state police lab using a sample of the defendant's blood. Id. An expert for the State testified that the private laboratory was accredited and that it provided the police with a DNA profile. Id. The expert also explained notations on documents admitted as business records stating that vaginal swabs taken from the victim were sent to, and received back from, the private laboratory. Id. The defendant contended that the expert's testimony violated the Confrontation Clause. Id. at 57.

The plurality of Justice Alito joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer "concluded that the testimonial evidence was used to support the expert's opinion and not for the truth of the matter asserted" (that the DNA profile came from semen found in the victim). McLeod, 165 N.H. at 48-49; see Williams, 567 U.S. at 71-79. "Justice Thomas, however, in his concurring opinion, and the four dissenting Justices rejected the . . . rationale that evidence supporting the basis of an expert's opinion is not offered for its truth." McLeod, 165 N.H. at 49; see Williams, 567 U.S. at 103-10 (Thomas, J., concurring), 125-33 (Kagan, J., dissenting).

Alternatively, the plurality decided that, even if the report containing the DNA profile produced by the private laboratory had been admitted into evidence for the truth of the matters asserted therein, the Confrontation Clause would not have been violated because the report "was not prepared for the primary purpose of accusing a targeted individual." Williams, 567 U.S. at 84. Rather, "its primary purpose was to catch a dangerous rapist who was still at

large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time." Id. Moreover, nobody at the private laboratory "could have possibly known that the profile that it produced would turn out to inculpate [the defendant]—or for that matter, anyone else whose DNA profile was in a law enforcement database." Id. at 84-85.

Justice Thomas disagreed, opining that the report's admission did not violate the Confrontation Clause solely because the testimony's implicit reference to an un-introduced report was not sufficiently formal to be considered "testimonial." Id. at 110-13 (Thomas, J., concurring). The plurality's rationale was also criticized by the dissent, "who asserted that the opinion threw into disorder the Court's previously settled test for assessing whether evidence is testimonial for confrontation purposes." State v. Michaels, 95 A.3d 648, 664 (N.J. 2014); see Williams, 567 U.S. at 135-38 (Kagan, J., dissenting).

Because each of the opinions in Williams "embraces a different approach to determining whether the use of forensic evidence violates the Confrontation Clause, and there is no narrow rule that would have the support of a majority of the Supreme Court," we agree with other jurisdictions that have concluded that its "force, as precedent, [is] at best unclear." Michaels, 95 A.3d at 666; see United States v. James, 712 F.3d 79, 95 (2d Cir. 2013) (concluding that because "[n]o single rationale disposing of the Williams case enjoys the support of a majority of the Justices" and because the case "does not . . . yield a single, useful holding," it is "confined to the particular set of facts presented in that case"); United States v. Turner, 709 F.3d 1187, 1189 (7th Cir. 2013) (observing that because of "the 4-1-4 division of the Justices . . . , with one Justice— Justice Thomas—concurring in the result but no portion of the plurality's reasoning, . . . it [is] somewhat challenging to apply Williams" (footnote omitted)).

C

We now turn to Isenschmid's testimony. Isenschmid is a forensic toxicologist for National Medical Services (NMS), a private laboratory based in Pennsylvania. According to the State's Chief Medical Examiner, in all autopsy cases, his office sends specimens from dead bodies to NMS for "a comprehensive screen . . . for any drugs or poisons." In the instant case, the medical examiner requested that NMS "do an expanded post-mortem toxicology panel" that "tests for about 230 different drugs and [for] alcohol." To test for alcohol, NMS uses a gas chromatograph machine, and to test for drugs, it uses "immunoassay" and "liquid chromatography time-of-flight mass spectrometry." The medical examiner's office informed NMS that it was suspected that the victim had died because of "drug abuse," potentially involving heroin and/or fentanyl.

12

As a fact witness, Isenschmid gave a general overview of the process that NMS uses for samples that arrive from out-of-state. He testified that the specimens are in a sealed box that is delivered overnight directly to a "secure processing area." At that point, NMS "start[s] a chain of custody," recording into a computer the condition of the box, the seals, and the specimens themselves. A portion of the original sample is then transferred into a tube and sent to a different area for testing. NMS documents "who made that transfer to the tube, and who received it." NMS then has "a chain of custody on who prepared the sample for analysis, who initially reviewed the results, and who did the secondary review of the results." The first person, who reviews "the data that comes off the instrument[,] . . . checks to make sure that all of the calibrations and controls worked properly." The first reviewer "verifie[s] all the quality assurance data" and enters the results into the computer system. The second reviewer checks "to see [that] all the data that the first reviewer put into the computer system was all properly transcribed and properly entered." "[F]inally, after all the laboratory testing is complete[,] a toxicologist[,] such as [Isenschmid,] will then review the entire case in the context of all the work that was done to issue a final report that's provided back to the client." According to Isenschmid, approximately 12 NMS employees handled the victim's blood and urine samples: five employees "dealt with the sample[s] coming in" and another seven prepared the samples for testing.

Isenschmid testified that when he reviews a case, he "look[s] at all the documentation," including "the chain of custody" and the "requisition," and he "make[s] sure everything has been entered properly into the computer system." Isenschmid testified that "if the sample had to be repeated for whatever reason, . . . [he] check[s] to see why it was repeated." If there is "a control failure," he "want[s] to know why" it occurred "and what was done."

He then "review[s] all of the instrument tracings to make sure that what was reported was in fact what [NMS has] in those tracings." Isenschmid defined "instrument tracings" as "the actual instrument data." Isenschmid testified that he "log[s] into [the] computer and look[s] at those instrument tracings . . . to verify the results." Isenschmid explained that NMS is "a paperless laboratory," such that "all of [its] analytical work is interfaced into [its] computer system."

With respect to the samples at issue, although Isenschmid did not "do the laboratory work" on the victim's blood or urine or supervise those who did, he "actually review[ed] all of the testing results that were generated by [NMS]" in this case, and issued and signed the report describing those results. The report, Isenschmid testified, accurately reflected his conclusions and findings.

As an expert forensic toxicologist, Isenschmid testified that, according to the toxicology tests, there were three compounds found in the victim's blood:

13

"[o]ne was a breakdown of marijuana," another was fentanyl, and a third was norfentanyl, a "metabolite breakdown product" of fentanyl.  He also testified that the victim's urine tested positive for marijuana and opiates.  He further testified that the level of fentanyl in the victim's blood was "21 nanograms per milliliter," which, he opined, is "a relatively large concentration of fentanyl," and that the level of norfentanyl was "2.2 nanograms per milliliter." Isenschmid then opined that the difference between the fentanyl and norfentanyl levels in the victim's blood indicated that the victim ingested a large dose of fentanyl and that he died "very shortly" after doing so.[1]

D

The defendant argues that his confrontation rights were violated because the analysts who tested the victim's blood and urine samples did not testify. He asserts that "[t]his inability to cross-examine the actual analysts who performed the testing prevented [him] from inquiring as to whether or not the quality control procedures, spoken to generally by . . . Isenschmid, were actually followed in the preparation and testing of the samples relating to this particular case or whether such testing was even performed."  He contends that had the State called the testing analysts, he "would have had the opportunity to ask them about their observations at the time of testing" and "could have inquired about the integrity of the sample."  Moreover, he argues, he could have cross-examined the analysts "about past issues regarding competency or disciplinary problems."

"We note at the outset the factual differences between this case and Melendez-Diaz and Bullcoming."  Michaels, 95 A.3d. at 673.  "First, unlike in Melendez-Diaz, where no witness was offered to testify to the statements contained in the state lab's forensic document that was admitted into evidence, here we are not asked to consider a self-admitting report."  Id.  Rather, the report in this case, from a private laboratory, was admitted through the testimony of Isenschmid, the forensic toxicologist who issued and signed it and who was available for cross-examination.  See id.

"Second, the forensic report and testimony admitted in this case differs in several respects from what happened in Bullcoming."  Id.  In Bullcoming, the "forensic report was admitted through the testimony of a co-analyst who did not observe the work of the . . . analyst who performed the testing and who did not serve as a supervisor or reviewer responsible for certifying the blood alcohol results obtained by the analyst whose work was referenced in the report."  Id.; see Bullcoming, 564 U.S. at 651-55; see also id. at 672-73 (Sotomayor, J., concurring).  "If all we had was a co-analyst reciting the findings contained in a report that he had not participated in preparing or evaluated independently, we

---

[1]  At trial, the defendant did not dispute that the victim had fentanyl in his system when he died.

14

would be faced with a scenario indistinguishable from <u>Bullcoming</u>." <u>Michaels</u>, 95 A.3d at 673. "But that is not the case here." <u>Id</u>.

In this case, Isenschmid reviewed "all the documentation" in the case, including the chain of custody, and ensured that all of the information had been correctly entered into the NMS computer system. Isenschmid personally reviewed the "actual instrument data" and made sure that the data were accurately entered into the NMS computer. Further, he "actually reviewed all of the testing results." He also issued and signed the toxicology report that described the testing results and testified that the report accurately reflected his findings and conclusions. His "participation in preparing the report and developing the substantive conclusions contained therein was real and direct." <u>Id</u>. at 674. The fact that Isenschmid was testifying regarding his own report "distinguishes him from the co-analyst in <u>Bullcoming</u>, who merely presented a blood alcohol report prepared by another [laboratory] co-employee." <u>Id</u>. Isenschmid "was not repeating the findings and conclusions of the analysts who manned the gas chromatography/mass spectrometry devices." <u>Id</u>. at 675. "Rather, the findings and conclusions contained in the report and to which he testified were his own." <u>Id</u>. As he testified, it was his job to review and verify the results of the tests performed on the victim's blood and urine samples. <u>See id</u>. We conclude, therefore, that the defendant's confrontation rights were not violated by Isenschmid's testimony. <u>See id</u>.

Our conclusion is consistent with <u>McLeod</u>. <u>McLeod</u> involved the testimony of three expert witnesses: a fire investigator who investigated an apartment building fire when it occurred in 1989, and two special agents from the Federal Bureau of Alcohol, Tobacco, and Firearms, who reinvestigated the fire in 2010. <u>McLeod</u>, 165 N.H. at 45-46. One of the special agents reviewed the fire investigator's methodology and conclusions; the other special agent reviewed the opinions and report of the first special agent. <u>Id</u>. at 46. When the fire investigator investigated the fire in 1989, he spoke with the occupant of the apartment in which the fire had begun. <u>Id</u>. at 45.

One of the issues on appeal was whether the occupant's testimonial statements were admissible through the experts' testimony. <u>Id</u>. at 46, 48. We agreed with the defendant that his confrontation rights would be violated were the State permitted to introduce the occupant's statements through the direct examination of its experts. <u>Id</u>. at 49.

We decided, however, that the experts' opinions need not be excluded because each of the three experts "applied their independent judgment to [the occupant's] statements" and were "not acting as mere 'transmitters' of testimonial hearsay." <u>Id</u>. at 54. For instance, the fire investigator "relied upon several types of evidence in reaching his conclusions, including physical evidence from the scene and field tests, as well as witness interviews," and,

15

although he assumed the truth of the occupant's statements, "he also considered the fact that she was unharmed [in the fire], and applied his knowledge of fire science and his experience." Id. The two special agents "also relied upon several types of evidence." Id. at 55. Further, we observed, it was "apparent that the experts reached their own independent conclusions." Id. We observed that the occupant's statements "have little significance as to the cause and origin of the fire in the absence of the experts' knowledge of fire science." Id. Thus, we held, "the Confrontation Clause does not prohibit [the experts] from testifying regarding their opinions." Id.

Here, as in McLeod, the Confrontation Clause does not preclude Isenschmid's testimony because, like the McLeod experts, he testified to his own, independent conclusions.

Although the defendant focuses primarily upon the failure of the analysts who actually tested the victim's blood and urine samples to testify, his argument appears to be broader. According to the defendant, Isenschmid "impliedly represented that the samples were received in the proper manner, that [they] were not compromised in any way, that certain tests were actually performed on those samples, that the machines used in the testing were properly calibrated, and that the analysts who performed the testing did so according to NMS . . . protocols and provided accurate and honest results." Yet, the defendant asserts, he "was unable to cross-examine anyone who performed or witnessed such tests and reviews as the State did not produce them." Taken to its extreme, the defendant implies that all 12 NMS employees who handled the victim's blood and urine samples must be produced in order for the State to introduce Isenschmid's testimony and report. See Michaels, 95 A.3d at 670-71. We disagree that this result is required by Supreme Court precedent. Melendez-Diaz, 557 U.S. at 311 n.1 (explaining that "it is not the case . . . that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case").

Although contrary authority exists,[2] we note that our decision today comports with those of at least seven federal courts and 21 state courts, which, in opinions issued since 2012, have found no Confrontation Clause violation under similar circumstances.[3] For all of the above reasons, therefore, we

[2] See McCord v. State, 390 P.3d 1184, 1185-86 (Alaska Ct. App. 2017); Martin v. State, 60 A.3d 1100, 1107-09 (Del. 2013).

[3] See Grim v. Fisher, 816 F.3d 296, 298-99 (5th Cir.), cert. denied, 137 S. Ct. 211 (2016); United States v. Maxwell, 724 F.3d 724, 726 (7th Cir. 2013); United States v. Pablo, 696 F.3d 1280, 1286, 1290-91 (10th Cir. 2012); Upshaw v. Holland, No. CV-15-295-JAK (RAO), 2016 WL 3869944, at *9 (C.D. Cal. Mar. 22, 2016); Pitre v. Griffin, No. 16 Civ. 6258 (BMC), 2016 WL 7442653, at *8 (E.D.N.Y. Dec. 26, 2016); Childers v. Warden Chillicothe Correctional Institution, No. 2:13-CV-00991, 2015 WL 5305237, at *9-11 (S.D. Ohio Sept. 10, 2015), report and recommendation adopted by 2015 WL 6755309 (S.D. Ohio Nov. 4, 2015); United States v. Katso,

16

affirm the trial court's decision. All issues that the defendant raised in his notice of appeal, but did not brief, are deemed waived. See State v. Berry, 148 N.H. 88, 93 (2002).

Affirmed.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

74 M.J. 273, 284 (C.A.A.F. 2015); Ex Parte Ware, 181 So. 3d 409, 416-17 (Ala. 2014); State v. Joseph, 283 P.3d 27, 29-30 (Ariz. 2012); State v. Salamone, No. 1 CA-CR16-0204, 2017 WL 2875096, at *2-3 (Ariz. Ct. App. July 6, 2017); State ex rel. Montgomery v. Karp, 336 P.3d 753, 756-57 (Ariz. Ct. App. 2014); Marshall v. People, 309 P.3d 943, 947 (Colo. 2013); Leger v. State, 732 S.E.2d 53, 60 (Ga. 2012); State v. Stanfield, 347 P.3d 175, 187-88 (Idaho 2015); Ackerman v. State, 51 N.E.3d 171, 184, 189 (Ind. 2016); Stambaugh v. Com., No. 2012-CA-000348-MR, 2013 WL 645746, at *1-3 (Ky. Ct. App. Feb. 22, 2013); State v. Bolden, 108 So. 3d 1159, 1161-62 (La. 2012); State v. Mercier, 87 A.3d 700, 704 (Me. 2014); Com. v. Greineder, 984 N.E.2d 804, 815-18 (Mass. 2013); Hingle v. State, 153 So. 3d 659, 664-65 (Miss. Ct. App. 2014); State v. Sauerbry, 447 S.W.3d 780, 789 (Mo. 2014); State v. Roach, 95 A.3d 683, 688, 697 (N.J. 2014); Michaels, 95 A.3d at 675; State v. Huettl, 305 P.3d 956, 966 (N.M. Ct. App. 2012); State v. Kuykendall, No. 32,612, 2014 WL 5782937, at *7 (N.M. Ct. App. Sept. 23, 2014); People v. Rodriguez, 59 N.Y.S.3d 337, 346-47 (App. Div. 2017); State v. Brewington, 743 S.E.2d 626, 627-28 (N.C. 2013); Com. v. Yohe, 79 A.3d 520, 540-41 (Pa. 2013); State v. Lopez, 45 A.3d 1, 13-14 (R.I. 2012); State v. Medicine Eagle, 835 N.W.2d 886, 898-99 (S.D. 2013); State v. Manion, 295 P.3d 270, 272, 278-79 (Wash. Ct. App. 2013); State v. Griep, 863 N.W.2d 567, 581-84 (Wis. 2015).