NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

EARL DEAN ROBBINS,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12494
Trial Court No. 3PA-15-00461 CR

O P I N I O N

No. 2653 — August 23, 2019

Appeal from the District Court, Third Judicial District, Palmer, John W. Wolfe, Judge.

Appearances: Josie W. Garton, Assistant Public Defender (briefing), Renee McFarland, Assistant Public Defender (oral argument), and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Eric A. Senta, Assistant Attorney General, Office of Special Prosecutions, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

Judge MANNHEIMER.

_____

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

This appeal raises a question regarding the scope of a criminal defendant's right of confrontation — a question that has bedeviled the courts of this country since 2004, when the United States Supreme Court re-interpreted the confrontation clause of the federal constitution in *Crawford v. Washington*.[1]

In *Crawford*, the Supreme Court held that the federal confrontation clause bars the government from introducing "testimonial" hearsay against a criminal defendant unless the defendant had an earlier adequate opportunity to cross-examine the speaker. But *Crawford*, and the Supreme Court decisions that have followed in the wake of *Crawford*, still do not define how the *Crawford* rule should be applied to situations where an expert witness gives testimony that relies on laboratory testing that was performed by someone else.

The defendant in the present case, Earl Dean Robbins, was arrested for driving under the influence after the police responded to the scene of a motor vehicle accident and discovered that Robbins (one of the drivers involved in the accident) was visibly impaired.

Following his arrest, Robbins submitted to a breath test, but this test showed that Robbins had no alcohol in his system. The police then obtained a sample of Robbins's blood, and this blood sample was ultimately sent to the Washington State Toxicology Laboratory for testing. This laboratory testing showed that Robbins had several controlled substances in his system, in amounts that would likely have impaired his driving.

At Robbins's trial, the State presented these test results through the testimony of Andrew Gingras, a forensic toxicologist working at the Washington

---

[1]  541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

laboratory. Here is a recapitulation of Gingras's testimony regarding the testing of Robbins's blood, viewed in the light most favorable to the trial court's ruling:

Robbins's case was assigned to Gingras, but Gingras did not perform all the testing himself. Gingras personally tested Robbins's blood for Xanax (alprazolam). Gingras also performed the preliminary test that detected Soma (carisoprodol) in Robbins's blood. However, another analyst at the laboratory, Lindsay Lowe, performed the follow-up testing that determined the exact quantities of Soma (both the drug itself, carisoprodol, and its metabolite, meprobamate).

After Lowe completed her testing of Robbins's blood for Soma, Gingras examined the resulting test data and reviewed it for any abnormalities. Gingras testified that he found no abnormalities and that, based on his review of Lowe's test data, he would have reached the same conclusions as Lowe about the levels of carisoprodol and meprobamate in Robbins's blood. Accordingly, Gingras certified all the test results on behalf of the Toxicology Laboratory — both Gingras's own testing for Xanax, and Lowe's testing for Soma.

On appeal, Robbins argues that the confrontation clause barred the State from presenting Gingras's testimony about the results of the Soma testing. Robbins asserts that Gingras's connection to the Soma testing was too attenuated to pass muster under the confrontation clause — that any testimony about those test results could only be given by the analyst who personally performed the tests, and that Gingras was an improper hearsay conduit for that testimony.

*Why we conclude that Gingras's testimony about the Soma test results did not violate the confrontation clause*

Our analysis of Robbins's case hinges on three court decisions: the United States Supreme Court's decisions in *Melendez-Diaz v. Massachusetts* (2009),[2] and *Bullcoming v. New Mexico* (2011),[3] and this Court's decision in *Vann v. State* (2010).[4]

*Melendez-Diaz* was the first time that the Supreme Court applied the *Crawford* confrontation rule to a criminal case that turned on the results of laboratory testing. The defendant in *Melendez-Diaz* was charged with unlawfully distributing cocaine. To prove that the substance in the defendant's possession was cocaine, the government did not produce any live witness, but instead relied solely on affidavits prepared by the state crime laboratory. These affidavits declared that the laboratory had tested the substance, and that the substance was cocaine.[5]

The Supreme Court held that these affidavits were "testimonial hearsay", that the introduction of these affidavits against the defendant violated the confrontation clause, and that the government was required to produce a live witness to testify about the results of the laboratory testing.[6] At the same time, however, the Court declared that the confrontation clause did *not* require live testimony from everyone involved in the testing process:

---

[2]   557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

[3]   564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).

[4]   229 P.3d 197 (Alaska App. 2010).

[5]   *Melendez-Diaz*, 557 U.S. at 310, 129 S.Ct. at 2532.

[6]   *Melendez-Diaz*, 557 U.S. at 310–11, 129 S.Ct. at 2532.

Contrary to the dissent's suggestion, ... we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, *authenticity of the sample, or accuracy of the testing device*, must appear in person as part of the prosecution's case.

*Melendez-Diaz*, 557 U.S. at 311 n. 1, 129 S.Ct. at 2532 n. 1 (emphasis added).

One year after the Supreme Court issued its decision in *Melendez-Diaz*, this Court issued our decision in *Vann v. State*. The defendant in *Vann* was charged with sexual assault, and the central issue litigated at trial was the identity of the assailant: Vann claimed that he had never met the victim, and that he was elsewhere on the night of the crime. [7]

To prove that Vann was the one who sexually assaulted the victim, the State presented the testimony of Cheryl Duda, a forensic analyst employed by the Alaska State Crime Laboratory. Duda testified that the laboratory received and tested five genetic samples taken from Vann, from the crime victim, and from physical objects associated with the crime. Duda described how the laboratory tested the samples for DNA, and she also described the method for comparing the DNA profiles obtained from this testing. Based on the results of this testing and comparison, Duda asserted that Vann could not be excluded as the source of DNA found in the samples retrieved from the victim. [8]

The confrontation issue in *Vann* arose from the fact that Duda had personally tested only three of the five genetic samples. The other two samples were

---

[7] *Vann*, 229 P.3d at 199.

[8] *Id.* at 199–200.

tested by another DNA analyst in the Crime Laboratory, and this analyst did not testify at Vann's trial.[9]

However, Duda testified that, after the other analyst tested the two genetic samples, Duda independently re-evaluated the other analyst's conclusions. Specifically, Duda testified that she examined the other analyst's "bench notes" to make sure that she followed proper testing protocols, and then Duda took the machine print-outs from the other analyst's testing and independently conducted her own DNA comparison analysis. Based on this analysis, Duda stated that she reached the same conclusion as the other analyst — *i.e.*, that Vann was not excluded as the source of the DNA found in the samples.[10]

On appeal, this Court concluded that Duda was properly allowed to testify about the test results obtained from all five genetic samples, even though she herself had personally tested only three of these samples.

After surveying the decisions of other courts that had applied *Melendez-Diaz* to this type of situation, we reached the following rule: If a witness is "simply a conduit" for the analysis performed by someone else — that is, if the witness simply "recapitulates" or "vouches for" the other person's analysis — then the confrontation clause is violated. But if the witness offers their own independent analysis or conclusion, the witness's testimony is permitted by the confrontation clause, even if the witness's analysis or conclusion is based on data obtained from other people's testing. *Vann*, 229 P.3d at 206.

One year after this Court decided *Vann*, the United States Supreme Court revisited this confrontation clause issue in *Bullcoming v. New Mexico*. The defendant

---

[9]   *Ibid.*

[10]   *Id.* at 200.

in *Bullcoming* was charged with driving under the influence, and the government introduced evidence of laboratory testing performed on a sample of Bullcoming's blood — testing which showed that Bullcoming's blood alcohol level was .21 percent. [11]

The facts of *Bullcoming* differed from the facts of *Melendez-Diaz* because, in *Bullcoming*, the test results were introduced through the testimony of an expert witness from the laboratory. The problem was that this witness was not the analyst who tested Bullcoming's blood. [12] Rather, the witness was a co-worker in the same laboratory. This witness was familiar with the testing apparatus and the testing procedures used by the laboratory, but he did not participate in or observe the testing of Bullcoming's blood, nor did he independently review or certify the results of that testing. [13]

The Supreme Court concluded that this expert witness's testimony violated the confrontation clause. Justice Ginsburg's lead opinion is worded in a way which suggests that the confrontation clause requires the government to present the testimony of someone who personally participated in the testing of the sample. The lead opinion emphasized that proper operation of the laboratory testing machine "requires specialized knowledge and training", and that "human error can occur at each step" of the testing process. [14] Justice Ginsburg pointed out that the testifying co-worker "could not convey what [the actual tester] knew or observed" during the testing process, nor could the co-worker "expose any lapses or lies on the certifying analyst's part". [15]

---

[11]  *Bullcoming*, 564 U.S. at 655–56, 131 S.Ct. at 2711–12.

[12]  *Id.*, 564 U.S. at 657, 131 S.Ct. at 2713.

[13]  *Id.*, 564 U.S. at 657, 661–62; 131 S.Ct. at 2712, 2715–16.

[14]  *Id.* 564 U.S. at 654, 113 S.Ct. at 2711.

[15]  *Id.*, 564 U.S. at 661–62, 113 S.Ct. at 2715.

Justice Ginsburg acknowledged that it was unlikely that the original analyst would still have a specific memory of testing the blood sample in Bullcoming's case, but she pointed out that requiring the analyst to testify in person would give Bullcoming's defense attorney the opportunity to question the analyst in front of the jury concerning his proficiency, care, and veracity. [16]

Based on the content of Justice Ginsburg's lead opinion, Robbins argues that *Bullcoming* effectively overruled key portions of this Court's decision in *Vann*. In particular, Robbins argues that, in light of *Bullcoming*, an expert witness is prohibited from testifying that another forensic analyst followed proper testing procedures, or that this other analyst obtained accurate test results.

But even though Justice Ginsburg's lead opinion offers several good reasons for requiring live testimony from the forensic analyst who actually performed the testing, most courts have not read *Bullcoming* so broadly.

The facts of *Bullcoming* presented a relatively easy confrontation issue — because, unlike the situation presented in *Vann*, the expert witness who testified at Bullcoming's trial had absolutely no connection either to the testing of Bullcoming's blood or to the review and analysis of the test results. Perhaps because of this, Justice Sotomayor concurred in the result of *Bullcoming*, but she wrote a separate opinion in which she emphasized what the Supreme Court was *not* deciding.

First, Justice Sotomayor noted that *Bullcoming* did not involve a blood test that was performed for medical reasons or for some other purpose apart from criminal investigation. [17]

---

[16] *Id.*, 564 U.S. at 661 n. 7, 113 S.Ct. at 2715 n. 7.

[17] *Bullcoming* (concurrence of Justice Sotomayor), 564 U.S. at 672, 113 S.Ct. at 2722.

Second, she noted that *Bullcoming* was "not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." [18]

Third, Justice Sotomayor noted that *Bullcoming* was not a case in which an expert witness was asked for their "independent opinion about underlying testimonial reports that were not themselves admitted into evidence." [19]

And finally, Justice Sotomayor noted that *Bullcoming* did not involve a situation where the government introduced the raw data obtained through testing and then asked an expert witness to analyze or interpret this data. [20]

Most courts have concluded that Justice Sotomayor's concurrence limits the holding in *Bullcoming*. [21] We agree with this assessment. And based on Justice Sotomayor's concurrence, we conclude that the confrontation clause did not prohibit the testimony offered by Andrew Gingras at Robbins's trial.

As we have explained, Justice Sotomayor pointed out in her concurrence that *Bullcoming* does not announce a rule for situations where the testifying witness is "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." Our decision in *Vann* involved such a situation, and Robbins's case does too.

---

[18]   *Id.*, 564 U.S. at 672–73, 113 S.Ct. at 2722.

[19]   *Id.*, 564 U.S. at 673, 113 S.Ct. at 2722.

[20]   *Id.*, 564 U.S. at 673–74, 113 S.Ct. at 2722.

[21]   *See*, *e.g.*, *United States v. Summers*, 666 F.3d 192, 200, 203 (4th Cir. 2011); *Marshall v. People*, 309 P.3d 943 (Colo. 2013), *cert. denied sub nomine Marshall v. Colorado*, 572 U.S. 1136, 134 S.Ct. 2661, 189 L.Ed.2d 212 (2014); *Disharoon v. State*, 727 S.E.2d 465, 467 (Ga. 2012); *Jenkins v. State*, 102 So.3d 1063, 1066–67 (Miss. 2012); *State v. Watson*, 185 A.3d 845, 854–55 (N.H. 2018); *Commonwealth v. Yohe*, 39 A.3d 381, 388 (Pa. App. 2012); *State v. Lopez*, 45 A.3d 1, 13 (R.I. 2012).

As we have explained, the testing in Robbins's case was performed by two forensic analysts: Gingras tested Robbins's blood for Xanax, and Lindsay Lowe tested Robbins's blood for Soma (and its metabolite, meprobamate).

When Gingras testified as the State's expert witness at Robbins's trial, he did not claim to be Lowe's "supervisor" in the sense of being hierarchically above her within the management structure of the crime laboratory. But Gingras testified that he was the forensic analyst who was personally assigned to Robbins's case. Gingras explained that, even though Lowe conducted certain aspects of the testing (*i.e.*, the testing to determine the precise level of Soma in Robbins's blood), Lowe's test results were forwarded to Gingras, and Gingras was responsible for reviewing those test results and certifying them (along with his own test results) as the official test results obtained by the Toxicology Laboratory.

Given these circumstances, we conclude that Gingras could properly testify regarding the results of the Soma testing performed by Lowe.[22]

We acknowledge that our resolution of this issue might appear to be at odds with our decision in *McCord v. State*, 390 P.3d 1184 (Alaska App. 2017). But, in fact, the same legal principle underlies our decisions in *McCord* and in the present case.

As in the present case, the testing of McCord's blood was performed at the Washington State Toxicology Laboratory, and the evidence regarding the presence and amount of the controlled substance in McCord's blood was offered through the testimony of a forensic analyst (Lisa Noble) employed by that laboratory. But although Noble was assigned to McCord's case, and although she conducted the initial screening of McCord's blood sample, it was another analyst (Sarah Swenson) who performed the

---

[22] *Accord*, *Marshall v. People*, 309 P.3d 943, 949 (Colo. 2013), *cert. denied*, 572 U.S. 1136, 134 S.Ct. 2661, 189 L.Ed.2d 212 (2014); *Jenkins v. State*, 102 So.3d 1063, 1069 (Miss. 2012); *State v. Watson*, 185 A.3d 845, 856–860 (N.H. 2018).

testing that confirmed the presence and the amount of clonazepam, which turned out to be the only controlled substance in McCord's blood.[23]

Noble only knew of the clonazepam in McCord's blood because she read Swenson's test results.[24] And Swenson was assigned to perform this testing because Noble herself was not certified to perform testing for that class of controlled substances.[25]

Thus, while Noble may have "reviewed" Swenson's test results in the sense that Swenson's results were reported to Noble, Noble was not personally certified to perform this testing, and it is unclear to what extent Noble was able to independently analyze a test that she herself was not certified to perform — or to what extent Noble could meaningfully answer the questions that McCord's attorney might have posed about the testing process. Based on this record, we held that McCord's right of confrontation was violated when the State introduced the evidence of the clonazepam in McCord's blood through the testimony of Noble, rather than calling Swenson as a witness.[26]

In Robbins's case, on the other hand, there was no dispute that Gingras could have tested Robbins's blood for Soma as well as for Xanax. The task of testing Robbins's blood for Soma was assigned to another analyst simply to divide the labor, and Gingras testified that, based on his review of the test data, he would have reached the same conclusions about the contents of Robbins's blood. Given this evidentiary record, Gingras's testimony about the results of the Soma testing did not violate Robbins's right of confrontation.

---

[23]    *McCord*, 390 P.3d at 1185, 1186.

[24]    *Id.* at 1186.

[25]    *Id.* at 1185.

[26]    *Id.* at 1186.

*Conclusion*

The judgement of the district court is AFFIRMED.